[No. 26038. Department Two. April 2, 1936.]

ERNEST PARRISH *et al., Appellants,* v. WEST COAST HOTEL COMPANY, *Respondent.*[1]

*C. B. Conner,* for appellant.

*Crollard & O'Connor,* for respondent.

MILLARD, C. J.—Mindful of the duty of the state to protect women and minors from conditions of labor which have a pernicious effect on their health and morals, the legislature enacted chapter 174, Laws of 1913, p. 602, Rem. Rev. Stat., § 7623 [P. C. § 3526], *et seq.* The provisions of the act pertinent to this appeal are as follows:

"Section 1. The welfare of the state of Washington demands that women and minors be protected from conditions of labor which have a pernicious effect on their health and morals. The state of Washing-

[1]Reported in 55 P. (2d) 1083.

ton, therefore, exercising herein its police and sovereign power declares that inadequate wages and unsanitary conditions of labor exert such pernicious effect." Rem. Rev. Stat., § 7623.

"Sec. 2. It shall be unlawful to employ women or minors in any industry or occupation within the state of Washington under conditions of labor detrimental to their health or morals; and it shall be unlawful to employ women workers in any industry within the state of Washington at wages which are not adequate for their maintenance." Rem. Rev. Stat., § 7624.

"Sec. 3. There is hereby created a commission to be known as the 'Industrial Welfare Commission' for the state of Washington, to establish such standards of wages and conditions of labor for women and minors employed within the state of Washington, as shall be held hereunder to be reasonable and not detrimental to health and morals, and which shall be sufficient for the decent maintenance of women." Rem. Rev. Stat., § 7624½.

From August, 1933, to May, 1935, when she was discharged, plaintiff was in the employ of defendant hotel corporation as a chambermaid at an agreed wage which was less than the minimum weekly wage of fourteen dollars and fifty cents as fixed by the Industrial Welfare Commission under § 3, chapter 174, Laws of 1913, p. 602, Rem. Rev. Stat., § 7624½. If payable at the agreed wage, defendant owes plaintiff a balance of seventeen dollars. If entitled to payment at the minimum rate established by the Industrial Welfare Commission, a balance of $216.19 is due to the plaintiff.

To recover that balance, plaintiff brought this action. The cause was tried to the court, which found that plaintiff was entitled to a recovery of seventeen dollars against defendant. The court further found that chapter 174, Laws of 1913, p. 602, in so far as it applies to adult women, is an unconstitutional interference with the freedom of contract included within

the guaranties of the due process clause of the constitution of the United States.

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Sec. 1, Amendment XIV, Federal Constitution.

Judgment was entered accordingly. Plaintiff appealed.

In *Larsen v. Rice,* 100 Wash. 642, 171 Pac. 1037, we held that the minimum wage law (chapter 174, Laws of 1913, p. 602), for women was constitutional. We said:

"It is undoubtedly a general rule that private controversies between individuals *sui juris* may be compromised by them by mutual agreement, and that the courts will not, where no question of fraud intervenes, relieve from the agreement, even though it be shown that the one gained rights thereby to which he would not otherwise have been entitled and that the other gave up rights to which he was fully entitled; this, on the principle that compromises are favored by the law, since they tend to prevent strife and conduce to peace and to the general welfare of the community. But the controversy here had an added element not found in the ordinary controversy between individuals. It was not wholly of private concern. It was affected with a public interest. The state, having declared that a minimum wage of a certain amount is necessary to a decent maintenance of an employee engaged in the employment in which the respondent was engaged, has an interest in seeing that the fixed compensation is actually paid. The statute making the declaration not only makes contracts of employment for less than the minimum wage void, but has sought to secure its enforcement by making it a penal offense on the part of the employer to pay less than the minimum wage, and by giving to the employee a right of action to recover

the difference between the wage actually paid and such minimum wage. The statute was not, therefore, intended solely for the benefit of the individual wage earner. It was believed that the welfare of the public requires that wage earners receive a wage sufficient for their decent maintenance. The statute being thus protective of the public as well as of the wage earner, it must follow that any contract of settlement of a controversy arising out of a failure to pay the fixed minimum wage in which the state did not participate is voidable, if not void. Especially must this be so, as here, where the contract of settlement is executory, has been repudiated by one of the parties, the parties can be placed *in statu quo,* and the wage earner, by carrying out the contract, will not receive the wage to which she is justly entitled."

The Oregon minimum wage law for women—in all essentials the same as our law—was sustained in *Stettler v. O'Hara,* 69 Ore. 519, 139 Pac. 743, L. R. A. 1917C 944, Ann. Cas. 1916A 217; and *Simpson v. O'Hara,* 70 Ore. 261, 141 Pac. 158. These two cases were affirmed without an opinion by an equally divided court in *Stettler v. O'Hara,* 243 U. S. 629, 37 S. Ct. 475, Mr. Justice Brandeis taking no part in the consideration and decision of the cases.

In *Bunting v. Oregon,* 243 U. S. 426, 37 S. Ct. 435, Ann. Cas. 1918A 1043, the United States supreme court sustained a wage-fixing statute. The statute limited the hours of labor of any person, whether man or woman, working in any mill, factory or manufacturing establishment, to ten hours a day, with a proviso requiring such employees, if they worked more than ten hours a day, to accept for the three additional hours permitted not less than fifty per cent more than their usual wage.

By act of September 19, 1918 (40 Stat. 960, c. 174), Congress provided for the fixing of minimum wages for women and children in the District of Columbia. The

statute was declared unconstitutional on the ground that it authorizes an unconstitutional interference with the freedom of contract included within the guaranties of the due process clause of the fifth amendment of the constitution of the United States. *Adkins v. Children's Hospital,* 261 U. S. 525, 43 S. Ct. 394, 24 A. L. R. 1238. Mr. Chief Justice Taft, dissenting, said:

"The boundary of the police power beyond which its exercise becomes an invasion of the guaranty of liberty under the Fifth and Fourteenth Amendments to the Constitution is not easy to mark. Our Court has been laboriously engaged in pricking out a line in successive cases. We must be careful, it seems to me, to follow that line as well as we can and not to depart from it by suggesting a distinction that is formal rather than real.

"Legislatures in limiting freedom of contract between employee and employer by a minimum wage proceed on the assumption that employees, in the class receiving least pay, are not upon a full level of equality of choice with their employer and in their necessitous circumstances are prone to accept pretty much anything that is offered. They are peculiarly subject to the overreaching of the harsh and greedy employer. The evils of the sweating system and of the long hours and low wages which are characteristic of it are well known. Now, I agree that it is a disputable question in the field of political economy how far a statutory requirement of maximum hours or minimum wages may be a useful remedy for these evils, and whether it may not make the case of the oppressed employee worse than it was before. But it is not the function of this Court to hold congressional acts invalid simply because they are passed to carry out economic views which the Court believes to be unwise or unsound.

"Legislatures which adopt a requirement of maximum hours or minimum wages may be presumed to believe that when sweating employers are prevented from paying unduly low wages by positive law they will continue their business, abating that part of their

profits, which were wrung from the necessities of their employees, and will concede the better terms required by the law; and that while in individual cases hardship may result, the restriction will enure to the benefit of the general class of employees in whose interest the law is passed and so to that of the community at large.

"The right of the legislature under the Fifth and Fourteenth Amendments to limit the hours of employment on the score of the health of the employee, it seems to me, has been firmly established. As to that, one would think, the line had been pricked out so that it has become a well formulated rule. In *Holden v. Hardy,* 169 U. S. 366, it was applied to miners and rested on the unfavorable environment of employment in mining and smelting. In *Lochner v. New York,* 198 U. S. 45, it was held that restricting those employed in bakeries to ten hours a day was an arbitrary and invalid interference with the liberty of contract secured by the Fourteenth Amendment. Then followed a number of cases beginning with *Muller v. Oregon,* 208 U. S. 412, sustaining the validity of a limit on maximum hours of labor for women to which I shall hereafter allude, and following these cases came *Bunting v. Oregon,* 243 U. S. 426. In that case, this Court sustained a law limiting the hours of labor of any person, whether man or woman, working in any mill, factory or manufacturing establishment to ten hours a day with a proviso as to further hours to which I shall hereafter advert. The law covered the whole field of industrial employment and certainly covered the case of persons employed in bakeries. Yet the opinion in the *Bunting* case does not mention the *Lochner* case. No one can suggest any constitutional distinction between employment in a bakery and one in any other kind of a manufacturing establishment which should make a limit of hours in the one invalid, and the same limit in the other permissible. It is impossible for me to reconcile the *Bunting* case and the *Lochner* case and I have always supposed that the *Lochner* case was thus overruled *sub silentio.* Yet the opinion of the Court herein in support of its conclusion quotes

from the opinion in the *Lochner* case as one which has been sometimes distinguished but never overruled. Certainly there was no attempt to distinguish it in the *Bunting* case.

"However, the opinion herein does not overrule the *Bunting* case in express terms, and therefore I assume that the conclusion in this case rests on the distinction between a minimum of wages and a maximum of hours in the limiting of liberty to contract. I regret to be at variance with the Court as to the substance of this distinction. In absolute freedom of contract the one term is as important as the other, for both enter equally into the consideration given and received, a restriction as to one is not any greater in essence than the other, and is of the same kind. One is the multiplier and the other the multiplicand.

"If it be said that long hours of labor have a more direct effect upon the health of the employee than the low wage, there is very respectable authority from close observers, disclosed in the record and in the literature on the subject quoted at length in the briefs, that they are equally harmful in this regard. Congress took this view and we can not say it was not warranted in so doing.

"With deference to the very able opinion of the Court and my brethren who concur in it, it appears to me to exaggerate the importance of the wage term of the contract of employment as more inviolate than its other terms. Its conclusion seems influenced by the fear that the concession of the power to impose a minimum wage must carry with it a concession of the power to fix a maximum wage. This, I submit, is a *non sequitur*. A line of distinction like the one under discussion in this case is, as the opinion elsewhere admits, a matter of degree and practical experience and not of pure logic. Certainly the wide difference between prescribing a minimum wage and a maximum wage could as a matter of degree and experience be easily affirmed.

"Moreover, there are decisions by this Court which have sustained legislative limitations in respect to the

wage term in contracts of employment. In *McLean v. Arkansas,* 211 U. S. 539, it was held within legislative power to make it unlawful to estimate the graduated pay of miners by weight after screening the coal. In *Knoxville Iron Co. v. Harbison,* 183 U. S. 13, it was held that store orders issued for wages must be redeemable in cash. In *Patterson v. Bark Eudora,* 190 U. S. 169, a law forbidding the payment of wages in advance was held valid. A like case is *Strathearn S. S. Co. v. Dillon,* 252 U. S. 348. While these did not impose a minimum on wages, they did take away from the employee the freedom to agree as to how they should be fixed, in what medium they should be paid, and when they should be paid, all features that might affect the amount or the mode of enjoyment of them. The first two really rested on the advantage the employer had in dealing with the employee. The third was deemed a proper curtailment of a sailor's right of contract in his own interest because of his proneness to squander his wages in port before sailing. In *Bunting v. Oregon, supra,* employees in a mill, factory or manufacturing establishment were required if they worked over ten hours a day to accept for the three additional hours permitted not less than fifty per cent more than their usual wage. This was sustained as a mild penalty imposed on the employer to enforce the limitation as to hours; but it necessarily curtailed the employee's freedom to contract to work for the wages he saw fit to accept during those three hours. I do not feel, therefore, that either on the basis of reason, experience or authority, the boundary of the police power should be drawn to include maximum hours and exclude a minimum wage.

"Without, however, expressing an opinion that a minimum wage limitation can be enacted for adult men, it is enough to say that the case before us involves only the application of the minimum wage to women. If I am right in thinking that the legislature can find as much support in experience for the view that a sweating wage has as great and as direct a tendency to bring about an injury to the health and morals of workers, as for the view that long hours

injure their health, then I respectfully submit that *Muller v. Oregon,* 208 U. S. 412, controls this case. The law which was there sustained forbade the employment of any female in any mechanical establishment or factory or laundry for more than ten hours. This covered a pretty wide field in women's work and it would not seem that any sound distinction between that case and this can be built up on the fact that the law before us applies to all occupations of women with power in the board to make certain exceptions. Mr. Justice Brewer, who spoke for the Court in *Muller v. Oregon,* based its conclusion on the natural limit to women's physical strength and the likelihood that long hours would therefore injure her health, and we have had since a series of cases which may be said to have established a rule of decision. *Riley v. Massachusetts,* 232 U. S. 671; *Miller v. Wilson,* 236 U. S. 373; *Bosley v. McLaughlin,* 236 U. S. 385. The cases covered restrictions in wide and varying fields of employment and in the later cases it will be found that the objection to the particular law was based not on the ground that it had general application but because it left out some employments.

"I am not sure from a reading of the opinion whether the Court thinks the authority of *Muller v. Oregon* is shaken by the adoption of the Nineteenth Amendment. The Nineteenth Amendment did not change the physical strength or limitations of women upon which the decision in *Muller v. Oregon* rests. The Amendment did give women political power and makes more certain that legislative provisions for their protection will be in accord with their interests as they see them. But I don't think we are warranted in varying constitutional construction based on physical differences between men and women, because of the Amendment.

"But for my inability to agree with some general observations in the forcible opinion of Mr. Justice Holmes who follows me, I should be silent and merely record my concurrence in what he says. It is perhaps wiser for me, however, in a case of this importance, separately to give my reasons for dissenting."

Mr. Justice Holmes' dissenting opinion reads, in part, as follows:

"The question in this case is the broad one, Whether Congress can establish minimum rates of wages for women in the District of Columbia with due provision for special circumstances, or whether we must say that Congress has no power to meddle with the matter at all. To me, notwithstanding the deference due to the prevailing judgment of the Court, the power of Congress seems absolutely free from doubt. · The end, to remove conditions leading to ill health, immorality and the deterioration of the race, no one would deny to be within the scope of constitutional legislation. The means are means that have the approval of Congress, of many States, and of those governments from which we have learned our greatest lessons. When so many intelligent persons, who have studied the matter more than any of us can, have thought that the means are effective and are worth the price, it seems to me impossible to deny that the belief reasonably may be held by reasonable men. If the law encountered no other objection than that the means bore no relation to the end or that they cost too much I do not suppose that anyone would venture to say that it was bad. I agree, of course, that a law answering the foregoing requirements might be invalidated by specific provisions of the Constitution. For instance it might take private property without just compensation. But in the present instance the only objection that can be urged is found within the vague contours of the Fifth Amendment, prohibiting the depriving any person of liberty or property without due process of law. To that I turn.

"The earlier decisions upon the same words in the Fourteenth Amendment began within our memory and went no farther than an unpretentious assertion of the liberty to follow the ordinary callings. Later that innocuous generality was expanded into the dogma, Liberty of Contract. Contract is not specially mentioned in the text that we have to construe. It is merely an example of doing what you want to do, embodied in the word liberty. But pretty much all law

consists in forbidding men to do some things that they want to do, and contract is no more exempt from law than other acts. Without enumerating all the restrictive laws that have been upheld I will mention a few that seem to me to have interfered with liberty of contract quite as seriously and directly as the one before us. Usury laws prohibit contracts by which a man receives more than so much interest for the money that he lends. Statutes of frauds restrict many contracts to certain forms. Some Sunday laws prohibit practically all contracts during one-seventh of our whole life. Insurance rates may be regulated. *German Alliance Insurance Co. v. Lewis*, 233 U. S. 389. (I concurred in that decision without regard to the public interest with which insurance was said to be clothed. It seemed to me that the principle was general.) Contracts may be forced upon the companies. *National Union Fire Insurance Co. v. Wanberg*, 260 U. S. 71. Employers of miners may be required to pay for coal by weight before screening. *McLean v. Arkansas*, 211 U. S. 539. Employers generally may be required to redeem in cash store orders accepted by their employees in payment. *Knoxville Iron Co. v. Harbison*, 183 U. S. 13. Payment of sailors in advance may be forbidden. *Patterson v. Bark Eudora*, 190 U. S. 169. The size of a loaf of bread may be established. *Schmidinger v. Chicago*, 226 U. S. 578. The responsibility of employers to their employees may be profoundly modified. *New York Central R. R. Co. v. White*, 243 U. S. 188. *Arizona Employers Liability Cases*, 250 U. S. 400. Finally women's hours of labor may be fixed; *Muller v. Oregon*, 208 U. S. 412; *Riley v. Massachusetts*, 232 U. S. 671, 679; *Hawley v. Walker*, 232 U. S. 718; *Miller v. Wilson*, 236 U. S. 373; *Bosley v. McLaughlin*, 236 U. S. 385; and the principle was extended to men with the allowance of a limited overtime to be paid for 'at the rate of time and one-half of the regular wage,' in *Bunting v. Oregon*, 243 U. S. 426.

"I confess that I do not understand the principle on which the power to fix a minimum for the wages of women can be denied by those who admit the power to fix a maximum for their hours of work. I fully assent to the proposition that here as elsewhere the

distinctions of the law are distinctions of degree, but I perceive no difference in the kind or degree of interference with liberty, the only matter with which we have any concern, between the one case and the other. The bargain is equally affected whichever half you regulate. *Muller v. Oregon,* I take it, is as good law today as it was in 1908. It will need more than the Nineteenth Amendment to convince me that there are no differences between men and women, or that legislation cannot take those differences into account. I should not hesitate to take them into account if I thought it necessary to sustain this act. *Quong Wing v. Kirkendall,* 223 U. S. 59, 63. But after *Bunting v. Oregon,* 243 U. S. 426, I had supposed that it was not necessary, and that *Lochner v. New York,* 198 U. S. 45, would be allowed a deserved repose.

"This statute does not compel anybody to pay anything. It simply forbids employment at rates below those fixed as the minimum requirement of health and right living. It is safe to assume that women will not be employed at even the lowest wages allowed unless they earn them, or unless the employer's business can sustain the burden. In short the law in its character and operation is like hundreds of so-called police laws that have been upheld."

Respondent insists that the foregoing decision of the United States supreme court is controlling, and that the judgment should be affirmed. Let us bear in mind that *Adkins v. Children's Hospital,* 261 U. S. 525, 43 S. Ct. 394, 24 A. L. R. 1238, was based upon an act of Congress passed for the District of Columbia.

In *O'Gorman & Young v. Hartford Fire Ins. Co.,* 282 U. S. 251, 51 S. Ct. 130, 72 A. L. R. 1163, the United States supreme court held that the business of insurance is so far affected with the public interest that the state may regulate the rates and likewise the relations of those engaged in business; that a state statute dealing with a subject clearly within the police power can not be declared void upon the ground that

the specific method of regulation prescribed by it is unreasonable, in the absence of any factual foundation in the record to overcome the presumption of constitutionality. The court said:

"The statute here questioned deals with a subject clearly within the scope of the police power. We are asked to declare it void on the ground that the specific method of regulation prescribed is unreasonable and hence deprives the plaintiff of due process of law. As underlying questions of fact may condition the constitutionality of legislation of this character, the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute. It does not appear upon the face of the statute, or from any facts of which the court must take judicial notice, that in New Jersey evils did not exist in the business of fire insurance for which this statutory provision was an appropriate remedy. The action of the legislature and of the highest court of the state indicates that such evils did exist. The record is barren of any allegation of fact tending to show unreasonableness."

That the powers not delegated to the United States by the constitution nor prohibited by it to the states are reserved to the states, needs no citation of sustaining authority. The police power of a state was not given to the Federal government nor prohibited by the constitution to the people of the respective states, hence it is one of the reserved powers. It is true that the employer and the employee are deprived to a certain extent of their liberty to contract by the minimum wage law. However, if the deprivation is with due process, if it corrects a known and stated public evil, if it promotes the public welfare—that is, if it is a reasonable exercise of the police power—it is constitutional and it is a proper exercise of legislative power.

In *Nebbia v. New York*, 291 U. S. 502, 54 S. Ct. 505, 89 A. L. R. 1469, it was held that one may be com-

594

pelled to pay a greater sum than that which may be asked because at another end of the industrial scale is found one who may not be paid what his product is worth and who may be unable to bargain freely with those who possess the marketing facilities. The court said:

"The law-making bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the law-making body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

The legal duty placed upon the employer by our minimum wage law is that he must pay women in his employ in wages a sum found to be necessary for the

maintenance of the health as well as the morals of the employee. If the wages paid equal or are in excess of the cost of the maintenance of a normal health standard, the state's concern in the matter ceases. If the employer pays less than the amount found to be the minimum cost of the maintenance of the normal health standard by virtue of his more secure and powerful economic position, the transaction savors of exploitation.

Restraints upon the liberty to contract have been declared constitutional in many cases, as cited in the dissenting opinion of Mr. Justice Holmes in *Adkins v. Children's Hospital,* 261 U. S. 525, 43 S. Ct. 394, 24 A. L. R. 1238. The underlying principle in all such cases is the state's right, the state's duty, to interfere in the terms of a contract between private parties when there is an inequality in bargaining power.

"And therefore I take it to be an established rule, that a mortgagee can never provide at the time of making the loan for any event or condition on which the equity of redemption shall be discharged, and the conveyance absolute. And there is great reason and justice in this rule, for necessitous men are not, truly speaking, free men, but, to answer a present exigency, will submit to any terms that the crafty may impose upon them." *Vernon v. Bethell,* 2 Eden's Chancery Reports 68.

The mere fact that the parties are of full age does not necessarily deprive the state of the power to interfere where the parties do not stand upon an equality, or where the public health demands that one party to a contract shall be protected against himself.

"The legislature has also recognized the fact, which the experience of legislators in many states has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, and that their interests are, to a certain extent, conflicting. The former naturally desire to obtain as much labor

as possible from their employes, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules and the laborers are practically constrained to obey them. In such cases self-interest is often an unsafe guide, and the legislature may properly interpose its authority.

"It may not be improper to suggest in this connection that although the prosecution in this case was against the employer of labor, who apparently under the statute is the only one liable, his defence is not so much that his right to contract has been infringed upon, but that the act works a peculiar hardship to his employes, whose right to labor as long as they please is alleged to be thereby violated. The argument would certainly come with better grace and greater cogency from the latter class. But the fact that both parties are of full age and competent to contract does not necessarily deprive the state of the power to interfere where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself. 'The state still retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all the parts, and when the individual health, safety and welfare are sacrificed or neglected, the state must suffer'." *Holden v. Hardy,* 169 U. S. 366, 18 S. Ct. 383.

We held in *Larsen v. Rice,* 100 Wash. 642, 171 Pac. 1037, that the controversy there, which differs in no important particular from the controversy here, had an added element not found in the ordinary controversy by the individual. It was not wholly a private concern. It was affected with a public interest, the state having declared the minimum wage of a certain amount to be necessary. Therefore, the state has an interest in the way that the fixed compensation is actually paid.

The statute is protective of the public as well as the wage earner.

If the state legislature and state supreme court find that the statute is of a public interest, the supreme court of the United States will accept such judgment in the absence of facts to support the contrary conclusion. Unless the supreme court of the United States can find beyond question that chapter 174, Laws of 1913, p. 602, Rem. Rev. Stat., § 7623 [P. C. § 3526], *et seq.,* is a plain, palpable invasion of rights secured by the fundamental law and has no real or substantial relation to the public morals or public welfare, then the law must be sustained. The United States supreme court has not yet held that a state statute such as the one in the case at bar is unconstitutional, and until such time—*Adkins v. Children's Hospital,* 261 U. S. 525, 43 S. Ct. 394, 24 A. L. R. 1238, is not controlling— we shall adhere to our holding in the case of *Larsen v. Rice,* 100 Wash. 642, 171 Pac. 1037; and *Spokane Hotel Co. v. Younger,* 113 Wash. 359, 194 Pac. 595. It does not appear upon the face of the minimum wage law or from any facts of which the supreme court of the United States must take judicial notice that, in the state of Washington, evils did not exist for which our minimum wage law was an appropriate remedy. The action of the state legislature and of this court indicates that such evils do exist.

The judgment is reversed, and the cause remanded with instructions to the trial court to enter judgment in favor of the appellant in an amount equal to the difference between the amount paid and the amount due under the minimum wage law.

HOLCOMB, MAIN, BLAKE, and BEALS, JJ., concur.