[No. 34854. *En Banc.* December 8, 1960.]

MILTON V. PRICE *et al., Appellants,* v. EVERGREEN CEMETERY COMPANY OF SEATTLE, *Respondent.*[1]

*Miracle, Treadwell & Prusan,* for appellants.

*Karr, Tuttle & Campbell,* for respondent.

OTT, J.—August 29, 1957, Milton V. Price made inquiry by telephone of the Evergreen Cemetery Company in Seattle relative to available space for the burial of an infant in that portion of the company's Washelli Cemetery set

[1]Reported in 357 P. (2d) 702.

aside for infants and known as "Babyland." He was informed that space was available.

The following day, Mr. and Mrs. Price (who are non-Caucasians) drove to the company's office located on the cemetery property and were advised that "Babyland" was restricted by the corporation rules to the burial of infants of the Caucasian race, but that their infant son could be buried in other sections of the cemetery property which were unrestricted and where both Caucasians and non-Caucasians were buried.

Based upon the company's refusal to inter their infant in "Babyland," the Prices instituted this action for damages against the Evergreen Cemetery Company, alleging violation of RCW 68.05.260 (Laws of 1953, chapter 290, § 53, p. 838), which provides:

"It shall be unlawful for any cemetery under this chapter to refuse burial to any person because such person may not be of the Caucasian race."

The cause was tried to the court, sitting with a jury. From a judgment based upon a verdict for the defendant cemetery company, the plaintiffs appeal.

This appeal raises the constitutionality of RCW 68.05.260, *supra*, which respondent contends is unconstitutional because its enactment was violative of Art. II, § 19, of the state constitution. With this contention, we agree.

Art. II, § 19, of the state constitution, provides that "No bill shall embrace more than one subject, and that shall be expressed in the title."

The title of Laws of 1953, chapter 290, p. 825 (being House Bill No. 85), reads as follows:

"An Act relating to the regulation of cemeteries; adding a new chapter to title 68, RCW, creating a cemetery board and defining its powers and duties; adding a new section to chapter 68.40, RCW; and amending sections 68.36.060, 68.36.070, 68.36.090; and amending sections 68.40.010, 68.40.020, 68.40.030, 68.40.040, 68.40.060, 68.40.070, 68.40.080; and amending sections 68.44.010, 68.44.020, 68.44.030, 68.44-.050, 68.44.070, 68.44.080, 68.44.090, 68.44.100, 68.44.110, 68.44.120, 68.44.160, 68.44.170, RCW, providing penalties, and repealing section 68.44.040, RCW."

The original bill contained fifty-three sections. The first twenty-four sections amended or repealed existing statutory provisions relating to endowment care for cemeteries. The balance of the act was devoted to the establishment of a cemetery fund, and the creation of a cemetery board, to be appointed by the governor, with explicit powers and duties in relation to the fund. The board was charged with the administration and enforcement of RCW 68.04 to 68.44, inclusive. To this bill was appended a floor amendment dealing with civil rights. By the floor amendment, the 1953 act then embraced two unrelated subjects, (1) civil rights, and (2) the endowment care funds of private cemeteries and the creation of a cemetery board.

The subject matter embraced in the above-quoted title adequately apprised the legislature of the contents of the act only as it related to the endowment care fund and its management.

■ The constitutional mandate is that "No bill shall embrace more than one subject . . ." In *State ex rel. Washington Toll Bridge Authority v. Yelle*, 32 Wn. (2d) 13, 200 P. (2d) 467 (1948), we said (p. 24):

"The purposes of this constitutional mandate are three-fold: (1) to protect and enlighten the members of the legislature against provisions in bills of which the titles give no intimation; (2) to apprise the people, through such publication of legislative proceedings as is usually made, concerning the subjects of legislation that are being considered; and (3) to prevent hodge-podge or log-rolling legislation. . . ."

■ In the instant case, the quoted title gave no intimation to the members of the legislature that they were voting either for or against civil rights, as applied to the sale or purchase of a lot in a privately owned cemetery. It is the enactment of this type of "hodge-podge or log-rolling legislation" that is prohibited by Art. II, § 19, of the state constitution. *State ex rel. Washington Toll Bridge Authority v. Yelle, supra.* See *Power, Inc., v. Huntley*, 39 Wn. (2d) 191, 235 P. (2d) 173 (1951).

We hold that RCW 68.05.260 (Laws of 1953, chapter 290,

§ 53, p. 838) is violative of Art. II, § 19, of the state constitution; hence, it is unconstitutional.

The judgment is affirmed.

Weaver, C. J., Mallery, Hill, Donworth, and Foster, JJ., concur.

Weaver, C. J.—This case was heard *En Banc* February 26, 1960. In justice to the writer of the foregoing opinion, it should be stated that it was not reassigned to him for opinion until September 20, 1960.

Mallery, J. (concurring)—This case is more significant for what it reveals, than for what it decides. It reveals an ultimate aspiration of the Negro race, but the only legal question passed upon is a defect in the title of a bill passed by the legislature.

This case demonstrates that the Negro desegregation program is not limited to *public* affairs. The right of white people to enjoy a choice of associates in their *private* lives is marked for extinction by the N.A.A.C.P. Compulsory total togetherness of Negroes and whites is to be achieved by judicial decrees in a series of Negro court actions. *Browning v. Slenderella Systems of Seattle*, 54 Wn. (2d) 440, 341 P. (2d) 859, was the opening gun of the campaign.

The undisputed facts in the instant litigation are that the Evergreen Cemetery has segregated sections restricted to white children, Masons, veterans, Lutherans, and so forth. These restrictions implement the universal desires of religious, racial, and fraternal groups to be associated in death as well as in life. "Birds of a feather flock together."

In view of the cemetery's long-standing segregation restrictions, it could not sell the Negro appellants a burial plot in "Babyland." The white parents who have relied upon the white restriction in question have acquired a right to the association of their own race exclusively. It is this specific right of segregation which this particular case in a series was brought to eliminate. Let it be noted that herein there is no refusal of sepulchre to a Negro nor any complaint as to quality of available burial plots.

The cemetery representative tried earnestly to show and sell appellants a burial plot in a children's section of the cemetery where both white and Negro children were interred. The appellants refused to even look at it. They insisted on burial in "Babyland" and brought this action for injuries to their feelings because they were not permitted to intrude upon the white children segregated therein. Obviously, if Negro children were admitted to "Babyland," its white exclusiveness would be gone, and it would be in the same category as the unsegregated section which was rejected by the Negro appellants. The appellants' grievance is the mere *existence of any exclusive section* for white children into which Negroes cannot intrude at will. In view of the fact that the respondent cemetery provides unsegregated facilities of equal quality for the general public, including Negroes, there is no other possible issue herein than that of compulsory total desegregation in cemeteries.

This lawsuit is but an incident, the second of a series, in the over-all Negro crusade to judicially deprive white people of their right to choose their associates in their private affairs.

The Negro race, ably led by N.A.A.C.P., makes the result of every Negro lawsuit the measure of its success in securing not only rights equal to whites in public affairs, but also of *special privileges* for Negroes in *private* affairs. This explains why the N.A.A.C.P. administers massive retaliation upon judges for opinions that do not advance the Negro cause. Witness the following excerpts from a circular mailed by N.A.A.C.P. in the recent election campaign:

"Justice Joseph A. Mallery wrote a dissenting opinion in the case which is reported in 54 Washington Reports (2d) at page 452. A dissenting opinion is one that is written by a judge who disagrees with the opinion of the majority of the judges. In his dissent, Justice Mallery stated: 'When a white woman is compelled to give a negress a Swedish massage, that too is involuntary servitude.' As authority for that statement he cited an opinion of a *Florida* court.

"  . . .

"Justice Mallery is now running for re-election to the

State Supreme Court in a non-partisan election. He is opposed for the position by a Seattle attorney. We urge you, in the interest of justice to all persons, regardless of race, religion or national origin, to cast your vote *against* Justice Mallery in the September 13th primary election and in the final election on November 8, 1960."

The case referred to is *Browning v. Slenderella Systems of Seattle, supra.* The statement "When a white woman is compelled against her will to give a negress a Swedish massage, that too is involuntary servitude," was made in a dissenting opinion in a case which the Negro race won. Even a dissenting opinion which does not countenance special privileges for Negroes requires the writer's elimination under the political tactics employed by the N.A.A.C.P.

A victorious crusade of the N.A.A.C.P. for the special privilege of Negroes to intrude upon white people in their private affairs can only be won at the expense of the traditional freedom of personal association which has always characterized the free world. Unfortunately, special privileges seem preferable on the part of those who enjoy them to other people's freedom. Specifically, Negroes rate their special privilege of *compulsory* private association more highly than the ancient right of white people to enjoy *voluntary* association.

From time immemorial the scope and extent of an individual's choice in his private affairs has been the Anglo-Saxon measure of his liberties. No individual right has been more cherished than the right to choose one's associates. Regimentation in the private affairs of life, on the other hand, has been the badge of the police state.

In America we are committed to the proposition that society is composed of individuals, and that the best interest of the public is served by preserving the individual's rights. This is the justification for the constitutional guarantee of minority rights against the encroachments of majorities. Indeed, it is upon this principle that the world now stands divided.

It remains to be seen how resistant our ancient liberties of private association will be to the variety of mass pres-

sures being mobilized by the N.A.A.C.P. It is, indeed, a concerted and aggressive force to be reckoned with. Experience has shown that an aggressive minority can frequently exact special privileges from an indifferent majority. It may be that the realization of the Negro dream of compulsory total togetherness is just around the corner.

FINLEY, J. (dissenting)—Article II, § 19, of our state constitution admonishes the legislature that (1) no bill shall embrace more than one subject, and (2) the subject of a bill must be expressed in its title. Contrary to the views of the majority, I am convinced that chapter 290, p. 825, Laws of 1953, satisfies both of the above constitutional requirements.

As an initial thrust questioning the merits of the majority's disposition of this case, I point to and emphasize the fact that the title of Laws of 1953, chapter 290, p. 825, actually should not be considered an issue in this case.

In enacting Laws of 1943, chapter 247, p. 743, the legislature promulgated a "General Cemetery Act," with the following title:

"AN ACT relating to and regulating cemeteries and the interment of dead human remains; repealing . . . [certain listed sections of prior enactments]; and providing penalties for violation thereof."

The General Cemetery Act was of a comprehensive regulatory nature. Sections 46 through 54 authorized the management of a cemetery to create and promulgate rules and regulations relating to the use of the cemetery. Section 47 authorized the management to "restrict and limit the use of all property within its cemetery." Other regulations contained in the General Cemetery Act relate to the construction of crematories and mausoleums, the acquisition and release of property, succession of interest in cemetery plots, agreements for perpetual care, and financial activities. In short, as the title states, the General Cemetery Act of 1943 was an act *regulating cemeteries*.

Laws of 1953, chapter 290, p. 825, was amendatory of the General Cemetery Act. It added some new sections

to the act, changed the wording of some of the existing sections, and repealed still another section. This court has held on a number of occasions that *the sufficiency of the title of an amendatory act will not be inquired into if the new matter is within the purview of the title of the original act*. *Goodnoe Hills School Dist. v. Forry* (1958), 52 Wn. (2d) 868, 329 P. (2d) 1083; *Keeting v. Public Utility Dist. No. 1* (1957), 49 Wn. (2d) 761, 306 P. (2d) 762; *St. Paul & Tacoma Lbr. Co. v. State* (1953), 40 Wn. (2d) 347, 243 P. (2d) 474.

The majority concedes that the title of the 1953 act ("AN ACT relating to the regulation of cemeteries; . . .") adequately describes the contents of the act as it relates to endowment care funds and their management. The slightly broader language of the title of the 1943 act would, of course, be at least equally inclusive as to endowment care funds. The majority believe, however, that, while management provisions relative to endowment care funds come within the title (1953 Act), as set out above; nevertheless, the title does not cover other management provisions which are characterized by the majority as relating to civil rights.

The reasoning or hypothesis obviously relied upon by the majority is that civil rights, or the enforcement thereof, is a *sui generis* field of law. I think this reasoning emphasizes distinctions without difference. Numerous matters which are the subject of legislative action naturally involve human relationships which cut across or include the matter of civil rights. State legislative attention and regulation relating to seemingly noncontroversial facets of a broad subject should not preclude legislative lawmakers from simultaneously taking cognizance of controversial aspects, such as civil rights, which are not *sui generis*, but in fact are germane to if not inherent in the subject.

Actually, neither endowment care funds nor civil rights are specifically alluded to in the title of either statute. But both topics have to do with the regulation of cemeteries: one deals with an aspect of the finances of cemeteries; the other deals with certain aspects of racial discrimination by or within cemeteries. There is no logical basis for distin-

guishing or asserting that the titles of either act apprised the legislators of one or the other, but not of both matters. Since the title of the 1943 Act refers to or includes "the interment of dead human remains," it seems to me that, if any part of the 1953 amendatory statute is within the scope of the 1943 title, it must be that portion prohibiting *discrimination in the interment of human remains.* Thus, in view of the inclusiveness of the title of the 1943 Act, there is no problem as to the title of the amendatory 1953 Act in relation to Art. II, § 19. *Goodnoe Hills School Dist. v. Forry, supra.*

Article II, § 19, is one of the most often litigated provisions of our state constitution. In *Gruen v. State Tax Comm.* (1949), 35 Wn. (2d) 1, 211 P. (2d) 651, after reviewing numerous decisions relating to Art. II, § 19, the court said:

"From the holdings in these cases we restate the rule as follows:

"*Titles to statutes may be general or restrictive*; or, in other words, *broad or narrow*, since the legislature in each case has the right to determine for itself how comprehensive shall be the object of the statute. And it also has a wide discretion in the particularity of the title selected to express it, provided that, by a fair construction, such title complies with the constitutional provision in question.

"A general title may be said to be one which is broad and comprehensive, and covers all legislation germane to the general subject stated. It is not an objection that it covers more than the subject of the body of the act, but it must not, in any event, cover less. It is not necessary that it index the details of the act, or give a synopsis of the means by which the object of the statute is to be accomplished. All matters which are germane to the subject may be embraced in one act. Under the true rule of construction, the scope of the general title should be held to embrace any provision of the act, directly or indirectly related to the subject expressed in the title and having a natural connection thereto, and not foreign thereto. Or, the rule may be stated as follows: Where the title of a legislative act expresses a general subject or purpose which is single, all matters which are naturally and reasonably connected with it, and all measures which will, or may, facilitate the accomplishment of the purpose so stated, are

properly included in the act and are germane to its title." (Italics mine.)

Among the many examples that may be cited to illustrate the liberal interpretation which this court has given general titles of statutes are *Klickitat County v. Jenner* (1942), 15 Wn. (2d) 373, 130 P. (2d) 880 "An Act relating to revenue and taxation," held broad enough to encompass the imposition of a retail sales tax upon the construction of a county courthouse where the supplies were furnished by the builder); *Holzman v. Spokane* (1916), 91 Wash. 418, 157 Pac. 1086 ("An act relating to local improvements in cities and towns, . . ." held sufficient for the inclusion of a section governing the effect of local assessments in foreclosure actions by holders of certificates of delinquency for general taxes); and *State v. Blaine* (1911), 64 Wash. 122, 116 Pac. 660 ("An act relating to crimes and punishments and the rights and custody of persons accused or convicted of crime, . . ." held adequate to encompass a provision that "every person convicted of a crime shall be a competent witness in any civil or criminal proceedings," but that his conviction may be proved by any competent evidence for the purpose of impeachment).

I certainly cannot agree with the first conclusion of the majority opinion—that the racial discrimination provision of the statute here in question is invalid because not adequately described in the title. Likewise, the other admonition of Art. II, § 19, regarding dual subjects, is not violated by the 1953 statute. Our leading case on the question of what constitutes a "subject" within the meaning of the constitutional provision is *Marston v. Humes* (1891), 3 Wash. 267, 28 Pac. 520. Therein we held that

". . . so long as the title embraces but one subject it is not inimical to such constitutional provision, even although the subject as thus used contains any number of sub-subjects. . . . In other words, the legislature may adopt just as comprehensive a title as it sees fit, and if such title when taken by itself relates to a unified subject or object, it is good, however much such unified subject is capable of division. . . ."

The *Marston* case has been reaffirmed many times by this court. The "subject" of the General Cemetery Act of 1943 was the regulation of cemeteries and the interment of human remains. Within this broad, comprehensive subject there are many logical subdivisions. In 1953, the legislature undertook to add other subdivisions and change some existing ones. The matters dealt with in 1953 were not necessarily interdependent, but they were logical subdivisions within the subject of cemetery regulation.

In *Casco Co. v. Public Utility Dist No. 1* (1951), 37 Wn. (2d) 777, 226 P. (2d) 235, we quoted with approval from 50 Am. Jur. 178, Statutes, § 197, the following statement:

" ' . . . Generally speaking, the courts are agreed that a statute may include every matter germane, referable, auxiliary, incidental, or subsidiary to, and not inconsistent with, or foreign to, *the general subject or object of the act.*' " (Italics mine.)

Constitutional infirmities as to title and subject (Art. II, § 19) usually are highly debatable matters. Consequently, arguments based on such grounds should, I think, be viewed with caution and generally are not too persuasive support for judicial negation of legislative action. In fact, under our cases, title and subject infirmities are perhaps the weakest weapons in the arsenal of legal logic now employed by bench and bar to question and attack the constitutional status of statutes.

Unquestionably, the state legislature, in enacting the statutory provision under review in this case, attempted to formulate a state policy proscribing racial discrimination against nonCaucasians in the sale, purchase and use of cemetery burial lots. The operation of cemeteries, involving as it does disposition of the remains of deceased persons, is, at least in several respects, a matter of public interest and necessity and, quite properly, subject to reasonable state police power regulations. When our state legislature has taken action in such a significant area of social policy, such action should not be frustrated by the judicial branch of government unless the grounds therefor are crystal clear. To my way of thinking, more persuasive,

if not conclusive, arguments than those suggested by the majority herein should be required before legislative action is to be invalidated on constitutional grounds. With the latter considerations particularly in mind, and for the reasons stated hereinbefore, it is my opinion that an exercise of judicial self restraint is indicated, and consequently, I disagree with the conclusion reached by the majority: that the statutory provisions involved in this case violate Art. II, § 19.

By holding against the appellants on this issue, and thus affirming the judgment, the majority logically and understandably refrains from any discussion of further constitutional and other grounds urged by respondent in support of the judgment. However, because I would reverse the judgment and grant a new trial, I feel bound to point out and to discuss those constitutional and other grounds urged most strongly by respondent to support the judgment and void the pertinent statutory provisions.

Respondent contended in the trial court and here on appeal that, in prohibiting refusal of burial "to any person because such person may not be of the Caucasian race," RCW 68.05.260 creates an unreasonable classification and grants unequal privileges to nonCaucasian citizens.

Art. I, § 12, Washington Constitution, provides:

"No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

Of this provision and the equal protection clause of the fourteenth amendment to the United States Constitution, we have said:

" . . . this court regards the equal privileges and immunities provision of Art. I, § 12, of the state constitution and the equal protection clause of the fourteenth amendment to the constitution of the United States as substantially identical." *The Texas Co. v. Cohn* (1941), 8 Wn. (2d) 360, 112 P. (2d) 522.

The appellants point out, and I agree, that, indirectly, the purpose of RCW 68.05.260 is to insure to all persons in this

state the right to access to cemetery facilities. In this connection, it is a matter of common knowledge that there is little or no significant racial discrimination as such in this state against persons of the Caucasian race. Thus, it would not seem idle speculation to assume that this fact was known to the legislature and that it was intelligently evaluated, so that in drafting and enacting RCW 68.05.260 the legislature was "pinpointing" the problem of racial discrimination as it existed; namely as to nonCaucasians. The precise question is the validity of an enactment which grants a special statutory privilege or protection to one class, but fails to grant the same privilege to another class for the reason that the latter does not, in fact, need such legislation. I am convinced that such an enactment may be upheld.

This conclusion, I think, is dictated and supported by the decision of the United States Supreme Court in *West Coast Hotel Co. v. Parrish* (1937), 300 U. S. 379, 81 L. Ed. 703, 57 S. Ct. 578, 108 A. L. R. 1330, affirming 185 Wash. 581, 55 P. (2d) 1083. In that case a statute, entitled *Minimum Wages for Women,* and fixing minimum wages for women, had been enacted by the Washington legislature. Laws of 1913, chapter 174. The United States Supreme Court rejected, in the following language, an argument similar to that made by respondent in the instant case:

" . . . The argument that the legislation in question constitutes an arbitrary discrimination, because it does not extend to men, is unavailing. This Court has frequently held that the legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach. The legislature 'is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest.' If 'the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.' There is no 'doctrinaire requirement' that the legislation should be couched in all embracing terms. . . . [Citing cases.] This familiar principle has repeatedly been applied to legislation which singles out women, and particular classes of women, in the exercise of the State's protective power. . . .

[Citing cases.] Their relative need in the presence of the evil, no less than the existence of the evil itself, is a matter for the legislative judgment."

Respondent's additional constitutional argument is that no reasonable ground exists to justify the distinction which RCW 68.05.280 makes between cemeteries because of their size; *i.e.* (in so far as the racial discrimination provisions are concerned) the exemption by the act of cemeteries of ten acres or less as opposed to larger cemeteries.

Classifications based on size have been sustained as constitutional in many instances. *State ex rel. Lindsey v. Derbyshire* (1914), 79 Wash. 227, 140 Pac. 540; *State v. McFarland* (1910), 60 Wash. 98, 110 Pac. 792; *New York ex rel. Bryant v. Zimmerman* (1928), 278 U. S. 63, 73 L. Ed. 184, 49 S. Ct. 61, 62 A. L. R. 785.

Further, as stated above, the legislature is free to recognize *degrees* of harm, and may direct its attention and confine its action to those classes of cases where the need is deemed to be the clearest, even though there may be other instances as to which legislative action also might have been taken; *West Coast Hotel Co. v. Parrish, supra.* Thus, the legislature could reasonably have concluded that, in relation to any existing problem of racial discrimination by cemeteries, those of ten or less acres in size are not sufficiently significant from the standpoint of public policy to require regulation. I am convinced that the classifications made by RCW 68.05.280 do not arbitrarily discriminate against the respondent.

The respondent further contends that, even if RCW 68.05.260 is constitutional, the appellants cannot base a claim for damages upon an alleged violation of the statute because it creates no civil right for which damages are recoverable. It is true that nowhere in the statute is a civil right for damages specifically spelled out. It is also true that the racial discrimination provisions were enacted merely as a part of a larger amendatory act adopted in 1953, creating a state cemetery board for the regulation of the cemetery industry. Laws of 1953, chapter 290. However, since the statute makes *unlawful* a refusal to bury

nonCaucasians because of race, the result in my opinion, in terms of legal logic and reasoning, must follow that the statute creates or establishes a civil right, and that for violation thereof a civil action for damages may be brought. In *Anderson v. Pantages Theatre Co.* (1921), 114 Wash. 24, 194 Pac. 813, this court was faced with a contention that the state "Public Accommodations Law" (now RCW 9.91-.010(2)) did not create a civil right to damages, but was merely a penal statute in that it specifically provides that a denial of the enjoyment of places of public accommodation on racial grounds *shall be a misdemeanor.* The court's answer to this contention was:

"This statute, while penal in form only, is both penal and remedial in its nature and effect. In addition to providing for a criminal punishment of proprietors of such places for discriminating against the admission thereto of persons on account of race, creed or color, it confers rights upon the individual—it confers upon all persons, regardless of their race, creed or color, the right to be admitted to the places enumerated on equal terms with all others.

"The person wrongfully discriminated against also has a civil remedy against the person guilty of the wrongful discrimination. . . ."

The *Pantages* case was cited with approval in our recent decision in *Browning v. Slenderella, supra.* The keynote of the two statutes, RCW 9.91.010(2) and RCW 68.05.260, is that both statutes make certain types of discrimination *wrongful.* RCW 9.91.010(2) does so by denominating the discrimination it prohibits a *misdemeanor*; whereas, RCW 68.05.260 does so by characterizing the prohibited discrimination as *unlawful.* I can see no distinction of compelling legal significance. From this it follows that (a) either refusal to bury a nonCaucasian or (b) denial of admission to a place of public accommodation *because of race* is an act of wrongful discrimination under the *enacted* legislative policy of this state, as to which, under the decision of this court in the *Pantages* case, the person wrongfully discriminated against has a civil remedy for provable damages.

Pursuant to the foregoing, and for other reasons not necessary to be stated herein, I am convinced that the judg-

ment of the trial court dismissing the appellants' complaint with prejudice should be reversed, and the cause remanded for a new trial, so I dissent.

ROSELLINI and HUNTER, JJ., concur with FINLEY, J.

March 9, 1961. Petition for rehearing denied.