[No. 34375. *En Banc.* July 9, 1959.]

OLA M. BROWNING et al., *Respondents,* v. SLENDERELLA SYSTEMS OF SEATTLE, *Appellant.*[1]

[1]Reported in 341 P. (2d) 859.

*Bayley, Fite, Westberg & Madden,* for appellant.

*James E. McIver,* for respondents.

*Philip L. Burton, John Caughlan, Francis Hoague, Kenneth A. MacDonald, Solie M. Ringold, Leonard W. Schroeter,* and *Robert W. Winsor, amici curiae.*

HILL, J.—This is a wrongful discrimination case.

Ola M. Browning, to whom we will refer throughout the opinion as though she were the only plaintiff, is colored and the wife of a dental surgeon in Seattle. On March 5, 1956, at about 10:25 a. m., she entered the Slenderella salon (operated by the defendant Slenderella Systems of Seattle), pursuant to an appointment made by telephone, for a courtesy demonstration of the Slenderella treatments. She gave her name at the reception desk, and was asked to be seated. She was not asked to sign the guest book, as others who came in were asked to do. She waited in the reception room until approximately 12:15 p. m., during which time she was assured on several occasions by the receptionist that she would be taken care of in a few minutes. In the meanwhile, however, the reception room would fill up with women and would empty again as they were served, and it became apparent to Mrs. Browning that everyone except herself was receiving service.

Near the end of that period, she had a conversation with the manager of the salon from whom she attempted to find out whether or not she could expect to be served. The answer was that "We have never served anybody but Caucasians and I just know you won't be happy here." When Mrs. Browning asked, "Why did you give me an

appointment?" the manager answered, "Well, you know by phone we have no way of knowing you were colored." The manager was otherwise courteous. Mrs. Browning testified: "I asked her finally if she planned to serve me. She never said yes or no. She said she knew I wouldn't be happy there. Then I went home." The foregoing statement is based on the plaintiff's testimony, and takes no account of the evidence offered by the defendant, excusatory of the admitted failure to serve the plaintiff during the two hours she was in the salon.

This action was brought by Mrs. Browning and her husband for damages for the "embarrassment, humiliation, mental anguish and emotional shock" allegedly suffered by Mrs. Browning in consequence of this act of discrimination against her. The trial court found:

"That on March 5, 1956, the plaintiff, Ola M. Browning was discriminated against on account of her race or color." (The defendant challenges this finding.)

"That the establishment known as the Slenderella System of Seattle, a corporation, and its business thereof, is within the meaning of the Public Accommodation Law, R. C. W. 9.91.010." (No exception is taken to this finding. It seems to us to be a conclusion of law, but it obviously is a determination that must be made before a cause of action can be established.)

From these findings the trial court drew the conclusion of law that the plaintiff was entitled to a judgment of seven hundred fifty dollars, together with costs. Judgment was entered for that amount, and the defendant appeals.

There are four issues in this case:

1. Was there discrimination against the plaintiff because of her race or color?

2. Was the discrimination within the purview of our public accommodation statute?

3. Is there a civil cause of action available to the person discriminated against in violation of that statute?

4. Do the findings of fact or the evidence support the judgment for damages in the sum of seven hundred fifty dollars?

All of these must be answered in the affirmative for the judgment to be sustained. The first three present little difficulty, and will be discussed with relative brevity; the fourth causes us considerable concern.

1. *Re: Discrimination.* The testimony of the plaintiff, as we have summarized it above, is sufficient to establish an act of discrimination by the defendant against the plaintiff on account of her race or color. The plaintiff was not told in so many words that she would not be served, or that she should leave; nor was any physical violence used or threatened. The defendant's employees were always courteous; however, one need not be obvious or forthright to effect a discrimination. As the New York court of appeals said in *In re Holland v. Edwards* (1954), 307 N. Y. 38, 45, 119 N. E. (2d) 581, 584, 44 A. L. R. (2d) 1130:

"One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive—for we deal with an area in which 'subtleties of conduct * * * play no small part.' (*Cf. Labor Bd. v. Express Pub. Co.,* 312 U. S. 426, 437.) . . ."

■■■■■ This case exemplifies the fact that discrimination may arise just as surely through "subtleties of conduct" as through an openly expressed refusal to serve. The trial court's finding on this issue is amply supported by the plaintiff's testimony.

2. *Re: Status of Defendant's Establishment.* The pertinent part of the applicable statute is RCW 9.91.010 (2), providing,

"Every person who denies to any other person because of race, creed, or color, the full enjoyment of any of the accommodations, advantages, facilities or privileges of any place of public resort, accommodation, assemblage, or amusement, shall be guilty of a misdemeanor."

(While this type of statute is directed against discrimination because of race, creed, or color, it will be referred to as the public accommodation statute to distinguish it

from RCW, chapter 49.60, which is denominated by the legislature as the "Law Against Discrimination," and to which reference is hereafter made.)

It is conceded that the defendant's salon where the discrimination occurred is a "place of public resort, accommodation, assemblage, or amusement," within the purview of the quoted statute. The legislature, by chapter 87, Laws of 1953, p. 156, re-enacted the 1909 public accommodation act, but added an additional subsection extending the meaning of various terms so as to remove the limitations which this court had placed on the act by its decision, in *Goff v. Savage* (1922), 122 Wash. 194, 210 Pac. 374, holding that a soda fountain in a drug store was not a place of public accommodation; and its dictum in *Finnesey v. Seattle Baseball Club* (1922), 122 Wash. 276, 210 Pac. 679, 30 A. L. R. 948, that a baseball park was not a place of public accommodation. Nor is any issue raised in this case with reference to the fact that the service sought by the plaintiff was a courtesy treatment, which was the distinction relied on by the Iowa supreme court in finding no actionable discrimination in *Brown v. J. H. Bell Co.* (1910), 146 Iowa 89, 123 N. W. 231, 27 L. R. A. (NS) 407, Ann. Cas. 1912B 852, where the defendant was giving away samples of coffee at a food show and declined to serve the plaintiff.

■ 3. *Re: Cause of Action.* A cause of action for damages can arise from a violation of our public accommodation act (RCW 9.91.010), notwithstanding the statute is criminal in form. *Powell v. Utz* (1949), 87 F. Supp. 811; *Randall v. Cowlitz Amusements, Inc.* (1938), 194 Wash. 82, 76 P. (2d) 1017; *Anderson v. Pantages Theatre Co.* (1921), 114 Wash. 24, 194 Pac. 813.

There is considerable variation in the provisions relating to damages in the public accommodation statutes of the various states (see note 1 in addendum).

■ This court—along with those of Iowa (*Humburd v. Crawford* (1905), 128 Iowa 743, 105 N. W. 330; see *Amos v. Prom, Inc.* (1953), 115 F. Supp. 127, and (1954), 117

F. Supp. 615, for analysis of Iowa cases and law), Michigan (*Bolden v. Grand Rapids Operating Corp.* (1927), 239 Mich. 318, 214 N. W. 241, 53 A. L. R. 183, [The Michigan statute has since been changed to specifically give the injured party a cause of action.]), New Jersey (*Raison v. Board of Education* (1927), 103 N. J. L. 547, 137 Atl. 847), and Pennsylvania (*Everett v. Harron* (1955), 380 Pa. 123, 110 A. (2d) 383)—takes the position that the statute, while penal in form, is remedial in its nature and effect and gives to the person wrongfully discriminated against a civil remedy against the person guilty of wrongful discrimination. *Anderson v. Pantages Theatre Co., supra.*

It is recognized that racial discrimination is a wrong that must be remedied. However, a civil action for damages for such discrimination is rarely resorted to in this state. This is probably due to the preference of those discriminated against to avail themselves of the administrative procedures (provided by RCW, chapter 49.60) through which the civil rights of minority groups can be secured through negotiation, conciliation, and persuasion, as well as through decrees based on adversary hearings before the board against discrimination. See note, 32 Wash. L. Rev. 185. These procedures are supplemented by making certain types of discrimination a misdemeanor. RCW 9.91.010.

■ Neither the administrative procedures, nor the penal provisions preclude the bringing of a civil action for damages, as is done here, for the violation of a right protected by the penal statute.

■■ 4. *Re: Damages.* Damages may be had for mental or emotional distress, even in the absence of any physical injury, when caused by a wrongful act intentionally done. *United States v. Hambleton* (1950), 185 F. (2d) 564, 23 A. L. R. (2d) 568; *Gadbury v. Bleitz* (1925), 133 Wash. 134, 233 Pac. 299, 44 A. L. R. 425; *Nordgren v. Lawrence* (1913), 74 Wash. 305, 133 Pac. 436; *Davis v. Tacoma R. & Power Co.* (1904), 35 Wash. 203, 77 Pac. 209. An act of discrimination in violation of a statute must be classed as a wrongful act intentionally done.

█ It is, however, not every emotional distress that warrants a judgment for substantial damages. The authorities are agreed that it must be a "severe emotional distress." Restatement, Torts (1948 Supp.), § 46.

William L. Prosser, dean of the university of California law school, gives an excellent and well documented statement concerning the development and present status of the law relative to mental and emotional disturbance, independent of any physical injury, in the law of torts in his recent (1955) Handbook of the Law of Torts (2nd ed.). See pages 38 through 46.

The changing concept of tort liability for emotional distress, unaccompanied by any physical injury, is well illustrated in the recent change from the statement in Restatement, Torts (1934), § 46, which read,

"CONDUCT INTENDED TO CAUSE EMOTIONAL DISTRESS ONLY. Except as stated in §§ 21 to 34 and § 48 [not here material], conduct which is intended or which though not so intended is likely to cause only a mental or emotional disturbance to another does not subject the actor to liability

"(a) for emotional distress resulting therefrom, or

"(b) for bodily harm unexpectably resulting from such disturbance."

to the following, which appears in the 1948 supplement to Restatement, Torts, § 46:

"CONDUCT INTENDED TO CAUSE EMOTIONAL DISTRESS ONLY. One who, without a privilege to do so, intentionally causes severe emotional distress to another is liable

"(a) for such emotional distress, and

"(b) for bodily harm resulting from it."

The key word is "severe." The American Law Institute makes the following statement as to the reason for the change:

"This is a part of the law of torts in which real developments have occurred in recent years and this development is continuing. The cases which have appeared since 1934 establish that the interest in freedom from severe emotional distress is protected against intentional invasion [citing cases].

"The change in Section 46 is necessary in order to give an accurate Restatement of the present American law.

There is a definite trend today in the United States to give an increasing amount of protection to the interest in freedom from emotional distress."

We quote also some of the comments under the new § 46:

"(g) In short, the rule stated in this section imposes liability for intentionally causing severe emotional distress in those situations in which the actor's conduct has gone beyond all reasonable bounds of decency. The prohibited conduct is conduct which in the eyes of decent men and women in a civilized community is considered outrageous and intolerable. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim 'Outrageous!'

"(h) The amount of damages to be awarded is a question for the trier of fact, subject to the power of the court to set aside a manifestly unreasonable award. Putting a valuation upon severe emotional distress where it is the only injury is no more difficult than evaluating it as an item of consequential damage, or than evaluating pain and suffering, or determining the amount to be awarded in a defamation case in which no special damages have been proved. . . .

"(i) The one who seeks damages must prove that he did suffer severe emotional distress. Although emotional distress is subjective there are many situations in which the genuineness of the claim that it was suffered is supported by the objective facts concerning the actor's conduct. The mere recitation of the conduct in Illustration 1 (As a practical joke, A falsely tells B that he has read in the paper that her son, C, who is a paratrooper in a division known to be then participating in an invasion of enemy territory in wartime, has been reported killed in action. B grieves over the supposed death of C. A is liable for the grief which he causes her.), . . . goes far to prove the truthfulness of the claim that the complainant did suffer intense grief. Knowledge of human nature tells one that intense grief is a normal emotional response to such a stimulus, and lack of such grief, an abnormal response. In such a case, the risk of the fabricated claim is slight and not sufficient to justify the denial of redress against the actor who intended to injure the other and succeeded."

We have no difficulty in finding that the conduct of

the defendant was "outrageous," but where is the proof of "severe emotional distress?"

The entire record upon the question of damages in this case is that the plaintiff was embarrassed by not being served in her turn and being conscious of the fact that it was because of her color. In the plaintiff's words, it was "Just the total embarrassment of the whole situation." The defendant's receptionist, and the manager, were courteous to her at all times, although evasive as to when she could be served. There was no public humiliation; none of the other women in the reception room was aware that there was an act of discrimination. The plaintiff's conversation with the manager took place in the foyer between the reception room and the treatment rooms, where no one could overhear what was said.

We do not mean to imply that because no one but the plaintiff and the representatives of the defendant knew of the discrimination that the offense is to be minimized, but from the emphasis which the cases place upon the fact that the complained discrimination was, as in *Powell v. Utz, supra,* "in the presence and hearing of others," one must conclude, as seems natural, that the publicity attached to the discrimination offers a greater stimulus to mental discomfort, embarrassment, or emotional distress.

The effect of the discrimination was, of course, purely subjective. When a representative of the defendant called the plaintiff the next day to apologize for what had happened, and to offer the plaintiff an appointment, the plaintiff thanked her for calling, but referred her to the plaintiff's attorney. This is more indicative of a desire for punitive action than of severe emotional distress. We can fully sympathize with the desire to punish the defendant for its discriminatory tactics, but punishment, under these circumstances, is the prerogative of the state. *Anderson v. Dalton* (1952), 40 Wn. (2d) 894, 246 P. (2d) 853, 35 A. L. R. (2d) 302; *Spokane Truck & Dray Co. v. Hoefer* (1891), 2 Wash. 45, 25 Pac. 1072.

Significantly, the trial court, in this case, did not concern itself with any question of emotional distress,

severe or otherwise; there was no finding that the plaintiff suffered any embarrassment, humiliation, mental anguish, or emotional shock. The trial court was apparently of the view that if the plaintiff was discriminated against, a judgment for substantial damages followed. This puts damages on a punitive and not a compensatory basis, and is contrary to our long-established rule that in the absence of statutory authorization for a different measure of damages the damages recovered must be compensatory.

The findings in this case, being simply that the defendant operated a place of public accommodation within the purview of RCW 9.91.010 and that the plaintiff was discriminated against therein on account of her race or color, do not support the judgment for seven hundred fifty dollars. We have, as indicated, gone behind the findings to determine whether the evidence establishes "severe emotional distress," and conclude that it does not, unless it can be said that "severe emotional distress" can be presumed from any unlawful discrimination.

The character of the act, and its natural consequences, makes that an arguable presumption, but there is still no evidence that supports a substantial judgment for compensatory damages.

It may well be that the difficulties of proof of compensatory damages in such cases indicate that states such as Iowa, which permit punitive or exemplary damages, have a more realistic approach to dealing with the problem of discrimination than we do.

These difficulties of proof may be the reason that some states provide that a person discriminated against may recover a penalty of a minimum amount and such other damages as may be established, and others establish the minimum and maximum amounts which can be recovered in a civil action. (See note 1 in addendum for states and recoveries granted or allowed.)

The supreme court of Illinois in commenting on the Illinois statute, which fixes a minimum recovery of twenty-five dollars and a maximum of five hundred dollars to

the person aggrieved by an act of discrimination, said that because damages could not be ascertained with any degree of certainty "The statute simply prescribes the minimum below which the caprice and the maximum beyond which the passion of a jury shall not fix damages." *Pickett v. Kuchan* (1926), 323 Ill. 138, 141, 153 N. E. 667, 50 A. L. R. 347.

 Having neither exemplary damages, nor statutory floors and ceilings for recovery in discrimination cases, and no evidence in this case to sustain a substantial award for compensatory damages, we have no alternative but to hold that the plaintiff has proven no more than nominal damages. Four of the eight states which provide for a minimum recovery in a civil action fix it at one hundred dollars (California, Massachusetts, New Jersey, and New York; see addendum, note 1). This seems to us a proper amount to regard as nominal damages in such a case.

The judgment for the plaintiff is affirmed, and the cause is remanded to the trial court for the reduction of damages to the nominal sum of one hundred dollars.

The plaintiff-respondent has sustained her judgment, but the defendant-appellant has succeeded in reducing the damages from seven hundred fifty dollars to a nominal amount. There being a modification of the judgment, both parties will pay their costs on this appeal.

DONWORTH, FINLEY, ROSELLINI, FOSTER, and HUNTER, JJ., concur.

WEAVER, C. J., dissents.

### ADDENDUM

NOTE 1. *Variations with reference to civil actions for damages for violations of public accommodation statutes.*

Two states specifically give a cause of action to the person discriminated against, without setting either a minimum or maximum for the recovery: Kansas (Gen. Stat. of Kansas, § 21-2424); Michigan (Mich. Stat. Ann., § 28.344). The Michigan statute provides for trebling the damages sustained.

Two states provide for a minimum recovery with no maximum: California, $100 (Cal. Civil Code, §§ 52 and 54); Wisconsin, $25 (Wis. Stat. Ann., § 942-04).

Three states provide for a maximum recovery with no minimum: Indiana, $100 (Ind. Stat. Ann., § 10-902); Minnesota, $500 (Minn. Stat. Ann., § 327.09); Oregon, $500 (Ore. Rev. Stat., § 30.680).

Six states set both a minimum and a maximum recovery: Colorado, $50 and $500 (Colo. Rev. Stat., § 25-1-2); Illinois, $25 and $500 (Ill. Stat. Ann., chapter 38, § 126); Massachusetts, $100 and $500 (Ann. Laws of Mass., chapter 272, § 98); New Jersey, $100 and $500 (N. J. Stat. Ann., § 10:1-6); New York, $100 and $500 (McKinney's Consol. Laws of N. Y., Book 8, § 41); Ohio, $50 and $500 (Ohio Rev. Code Ann., § 2901-35).

Six states, in addition to Washington, have statutes which are penal in nature, making no mention of any civil remedy: Alaska (Comp. Laws of Alaska, § 20-1-4); Connecticut (Gen. Stat. of Conn., § 53.35); Iowa (Iowa Code Ann., § 735.2); Nebraska (Rev. Stat. of Neb., § 20-102); New Hampshire (N. H. Rev. Stat. Ann., § 354.4); Pennsylvania (Purdon's Penn. Stat. Ann. 18, § 4654).

(No attempt has been made to determine how many of these states permit punitive or exemplary damages. It is clear that Iowa does. See *Amos v. Prom, Inc.* (1954), 117 F. Supp. 615, for an extensive review of the Iowa cases.)

The statutes of all of the states above referred to, except California and Oregon, make a violation of the public accommodation statutes a criminal offense, generally a misdemeanor, carrying the penalty of a fine or imprisonment or both. Michigan adds a further possible penalty, the revocation of an offender's business license if one is held. In four states (Colorado, Indiana, Wisconsin, and Ohio) judgment in a civil action bars a criminal proceeding and vice versa.

Montana's statute goes no further than the statement of a public policy against discrimination on the basis of race, creed, or color (Rev. Codes of Mont., § 64-211).

Many of these states have created administrative agencies, like our own board against discrimination (RCW, chapter 49.60) to work to eliminate conditions of discrimination. In Rhode Island, an appeal to such an administrative agency appears to be the only means of redressing and eliminating conditions of discrimination, except as to discrimination against those wearing the uniform of the United States, and, in such a case, $100 plus the damages sustained may be recovered. (Gen'l. Laws of R. I., §§ 11-24-1 to 11-24-8).

MALLERY, J. (dissenting)—Because respondent is a negress, the Slenderella Systems of Seattle, a private enterprise, courteously refused to give her a free reducing treatment, as advertised. She thereupon became abusive and brought this civil action for the injury to her feelings caused by the racial discrimination.

This is the first such action in this state. In allowing respondent to maintain her action, the majority opinion

has stricken down the constitutional right of all *private* individuals of every race to choose with whom they will deal and associate in their *private* affairs.

No sanction for this result can be found in the recent segregation cases in the United States supreme court involving Negro rights in *public* schools and *public* busses. These decisions were predicated upon section 1 of the fourteenth amendment to the United States constitution, which reads:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the *privileges* or *immunities* of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the *equal* protection of the laws." (Italics mine.)

In the pre-Warren era, the courts had held that the privileges of Negroes under the fourteenth amendment, *supra,* were not *abridged* if they had available to them public services and facilities of *equal quality* to those enjoyed by white people. The Warren antisegregation rule abandoned that standard and substituted the unsegregated enjoyment of public services and facilities as the sole test of Negro equality before the law in such *public institutions.*

The *rights* and *privileges* of the fourteenth amendment, *supra,* as treated in the segregation decisions and as understood by everybody, related to *public institutions* and *public utilities* for the obvious reason that no person, whether white, black, red, or yellow, has any right whatever to compel another to do business with him in his *private* affairs.

No public institution or public utility is involved in the instant case. The Slenderella enterprise was not established by law to serve a public purpose. It is not a *public* utility with monopoly prerogatives granted to it by franchise in exchange for an unqualified obligation to serve everyone alike. Its employees are not public servants or

officers. It deals in *private personal services*. Its business, like most service trades, is conducted pursuant to informal contracts. The fee is the consideration for the service. It is true the contracts are neither signed, sealed, nor reduced to writing. They are contracts, nevertheless, and, as such, must be voluntarily made and are then, and only then, mutually enforceable. Since either party can refuse to contract, the respondent had no more right to compel service than Slenderella had to compel her to patronize its business.

There is a clear distinction between the nondiscrimination enjoined upon a public employee in the discharge of his official duties, which are prescribed by laws applicable to all, and his unlimited freedom of action in his private affairs. There is no anology between a public housing project operated in the government's proprietary capacity, wherein Negroes have equal rights, and a private home where there are no public rights whatever and into which even the King cannot enter.

No one is obliged to rent a room in one's home; but, if one chooses to operate a boarding house therein, it can be done with a clientele selected according to the taste or even the whim of the landlord. This right of discrimination in private businesses is a constitutional one.

The ninth amendment to the United States constitution specifically provides:

"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

All persons familiar with the rights of English speaking peoples know that their liberty inheres in the scope of the individual's right to make uncoerced choices as to what he will think and say; to what religion he will adhere; what occupation he will choose; where, when, how, and for whom he will work, and generally to be free to make his own decisions and choose his courses of action in his private civil affairs. These constitutional rights of law-abiding citizens are the very essence of American

liberties. For instance, they far outweigh in importance the fifth amendment to the United States constitution which excuses criminals from giving evidence against themselves. It was, in fact, an afterthought. Our constitional forefathers were chiefly concerned with the rights of honest men. They would have specified their rights with the same particularity that they did in regard to criminals if they had foreseen that courts would become unfamiliar with them.

In a Saturday Evening Post article of April 4, 1959, p. 32, entitled "When a Negro Moves Next Door," a Negro, who had bought a house in the white district of Ashburton in Baltimore, told the assembled neighbors:

" 'If you want to protect your home and your way of life . . . continue living in your own home. . . .

" 'Don't think you can escape the problem simply by putting your house up for sale and running away . . . Even if you move far out in the suburbs . . . There will be Negroes living near you.

" '*As a matter of fact, . . . if this area turns all Negro, I plan to move out to the suburbs with you.'* " (Italics mine.)

If he does make such a move, he will be discriminating against Negroes. This he has a right to do for discrimination is but another word for free choice. Indeed, he would not be free himself if he had no right so to do. In dealings between men, both cannot be free unless each acts *voluntarily,* otherwise one is subjected to the other's will.

Cash registers ring for a Negro's as well as for a white man's money. Practically all American businesses, excepting a few having social overtones or involving personal services, actively seek Negro patronage for that reason. The few that do not serve Negroes adopt that policy either because their clientele insist upon exclusiveness, or because of the reluctance of employees to render intimate personal service to Negroes. Both the clientele and the business operator have a constitutional right to discriminate in their private affairs upon any conceivable basis. The right to exclusiveness, like the right to privacy, is

essential to freedom. No one is legally aggrieved by its exercise.

No sanction for destroying our most precious heritage can be found in the *criminal* statute cited by the majority opinion. It does not purport to create a civil cause of action. The statute refers to "places of *public* resort." (Italics mine.) This phrase is without constitutional or legal significance. It has no magic to convert a *private* business into a governmental institution. If one man a week comes to a tailor shop, it is a place of *public resort,* but that does not make it a public utility or public institution, and the tailor still has the right to select his private clientele if he chooses to do so. As a matter of fact, the statute in question is not even valid as a *criminal* statute. Obviously, this is not the occasion, however, to demonstrate its unconstitutionality.

The majority can find no sanction for violating the constitutional rights of the appellant by citing the conflicting decisions of foreign states for two conclusive reasons. (1) Only this court can declare the law or set a precedent in Washington. (2) Foreign courts are in substantial conflict on so many questions of law that they can neither be harmonized nor followed. Practical uniformity of laws has been attained between the states only by the uniform acts passed by the several legislatures.

The majority opinion violates the thirteenth amendment to the United States constitution. It provides, *inter alia:*

"Neither slavery nor *involuntary servitude* . . . shall exist within the United States . . . " (Italics mine.)

Negroes should be familiar with this amendment. Since its passage, they have not been compelled to serve any man against their will. When a white woman is compelled against her will to give a negress a Swedish massage, that too is involuntary servitude. *Henderson v. Coleman,* 150 Fla. 185, 7 So. (2d) 117.

Through what an arc the pendulum of Negro rights has swung since the extreme position of the Dred Scott de-

cision! Those rights reached dead center when the thirteenth amendment to the United States constitution abolished the ancient wrong of Negro slavery. This court has now swung to the opposite extreme in its opinion subjecting white people to "involuntary servitude" to Negroes.

I dissent.

OTT, J., concurs with MALLERY, J.

