[No. 44623.   En Banc.   June 30, 1977.]

DAVID A. CONTRERAS, ET AL, *Appellants,* v. CROWN
ZELLERBACH CORPORATION, *Respondent.*

*R. Graham Cross,* for appellants.

*Paul R. Roesch, Jr.* (of *Studley, Purcell, Spencer & Guinn*), for respondent.

UTTER, J.—David Contreras and his wife brought an action against Crown Zellerbach Corporation alleging five causes of action based upon allegedly abusive and improper conduct of Crown Zellerbach's employees and supervisory personnel. Crown Zellerbach moved to dismiss the first claim for relief, which is premised upon the tort of outrage, for failure to state a claim. The trial court granted this motion to dismiss and Contreras appeals. One remaining claim was dismissed by stipulation of the parties and claims for relief under the Washington civil rights act, RCW 49.60, the Civil Rights Act of 1866, 42 U.S.C. § 1981, and a claim for conspiracy under 42 U.S.C. § 1985, still remain. We reverse the trial court and find the pleadings state a claim based upon the tort of outrage as defined in Restatement (Second) of Torts § 46(1).

Appellants' complaint alleges the following facts: David Contreras and his wife lived in Cathlamet where Mr. Contreras was employed by respondent through the fall and winter of 1973. He was wrongfully terminated on January 24, 1974. During the time of his employment he was subjected to continuous humiliation and embarrassment by reason of racial jokes, slurs and comments made in his presence by agents and employees of the defendant corporation on the jobsite and during working hours. Respondent's foreman and managing agents failed to control their employees and to accord appellant the right to work free of racial discrimination, slurs, comments and pressures. Respondent's agents and employees, while acting within the scope of their employment, both while appellant was employed and after his discharge, made numerous statements accusing appellant wrongfully of stealing property owned by respondent. The effect of these untrue statements was to prevent appellant from seeking and holding permanent employment in the Cathlamet area and to hold him and his wife up to public scorn and ridicule. Some of

the statements made by respondent's agents and employees were made maliciously or with knowledge of their falsity or when they should have known the statements were false. This conduct resulted in an inability of appellant to obtain employment which in turn made him unable to pay his bills and ruined an otherwise excellent credit rating. His failure to find full-time employment is a direct and proximate result of respondent's agents and employees' slander and racial actions.

Appellant's claim for relief is that respondent's conduct was intentional or reckless and so extreme in degree as to be beyond all reasonable bounds of decency. Such conduct in turn caused him severe emotional distress by reason of the acts of intimidation, demotions, humiliations and public exposure to scorn and ridicule when respondent's agents knew or should have known that appellant, by reason of his nationality and background as a Mexican–American, was particularly susceptible to emotional distress from defendant's conduct. He alleges respondent's conduct thereby amounts to the tort of outrage.[1]

The trial court indicated it was dismissing the first cause of action based upon the tort of outrage inasmuch as the only authority for the tort of outrage in this state, *Grimsby v. Samson*, 85 Wn.2d 52, 530 P.2d 291 (1975), was limited to the facts of that case. In *Grimsby,* this court considered whether we would adopt subsection (2) of Restatement (Second) of Torts § 46. The facts there involved a claim by

---

[1]Restatement (Second) of Torts § 46 reads as follows:

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

"(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

"(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

"(b) to any other person who is present at the time, if such distress results in bodily harm."

a husband for recovery of tort damages for distress he suffered when the hospital and doctors treating his wife allegedly breached the patient–physician relationship by abandoning her and failing to provide medical care causing suffering and resulting in her death before his eyes. The facts of that case, by necessity, involved only a claim by a member of a third person's family, the husband, who was present at the time allegedly outrageous conduct was visited on his wife. We there adopted the tort of outrage for conduct against the wife which the husband had witnessed. We specifically held, among other limitations adopted, that "the plaintiff must be an *immediate family member* of the person who is the object of the defendant's actions, and he must be *present at the time of such conduct* (comment *l*)." *Grimsby v. Samson, supra* at 60.

The trial court believed by our emphasis on the fact that the plaintiff must be an immediate family member of the person who is the object of the defendant's actions, that it was our intent to limit this tort to third–person situations only. While this interpretation is arguable, such was not our intent. We went on to say in *Grimsby,* at page 60, that "we adopt the theory of Restatement (Second) of Torts § 46(1), (2) and (2)(a) . . ." There is no reason to limit recovery on the tort of outrage to members of the family of those directly injured while excluding recovery by the person primarily injured and we decline to do so. W. Prosser, *Insult and Outrage,* 44 Cal. L. Rev. 40 (1956). A vast majority of cases involving the tort of outrage have been actions brought by the recipient of the conduct. *Agis v. Howard Johnson Co.,* __ Mass. __, 355 N.E.2d 315 (1976); *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145 (1974); *Alcorn v. Anbro Eng'r, Inc.,* 2 Cal. 3d 493, 468 P.2d 216, 86 Cal. Rptr. 88 (1970); *see* Annot., 64 A.L.R.2d 100 (1959).

Liability for outrage is of ancient lineage. The law in the classical age of the Roman Empire allowed recovery for outrage or insult as the delict of "iniuria." It required an intent to insult and that anger be shown as soon as the

facts were known. Intent to insult, however, could be presumed from the facts, which spoke for themselves. Defamation under Roman law was also a case of "iniuria," where the basis of liability was not loss of reputation but outrage to feelings. Publication to a third party was thus arguably unnecessary. W. Buckland & A. McNair, *Roman Law and Common Law* 295–300 (1936).

Acceptance of the tort of outrage has undergone a remarkable evolutionary process in the United States in a relatively short time. Section 46 of the Restatement of Torts in its original form stated flatly there was no liability for the intentional infliction of emotional distress, or for bodily harm resulting from it, except in cases of assault and of the special liability of carriers covered in section 48. This position was reversed in the 1948 supplement and the comments were completely rewritten. Restatement (Second) of Torts § 46, at 21 (Tent. Draft No. 1, 1957). The Restatement and courts supporting it have since drastically changed their position, from denial of liability for intentionally inflicting emotional distress to the allowance of liability against one who intentionally caused emotional distress without privilege to do so, and later to the present rule which requires that the conduct be extreme and outrageous before liability will attach. *Pakos v. Clark,* 253 Ore. 113, 453 P.2d 682 (1969).

In *Browning v. Slenderella Sys.,* 54 Wn.2d 440, 341 P.2d 859 (1959), we held recovery could be premised upon tort liability for emotional distress, unaccompanied by any physical injury where the victim was injured by racially discriminatory action. The court there recognized that the 1948 supplement to Restatement of Torts § 46 changed the language in the initial statement in Restatement, Torts (1934), section 46, to allow recovery from "'[o]ne who, without a privilege to do so, intentionally causes severe emotional distress to another . . .'" In its opinion this court quoted subsection (g) of the then section 46:

"(g) In short, the rule stated in this section imposes liability for intentionally causing severe emotional distress in those situations in which the actor's conduct has gone beyond all reasonable bounds of decency. The prohibited conduct is conduct which in the eyes of decent men and women in a civilized community is considered outrageous and intolerable. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim 'Outrageous!'

*Browning v. Slenderella Sys., supra* at 447, 448. Thus, even before *Grimsby v. Samson, supra,* and in harmony with many other jurisdictions, we recognized liability could be premised on outrageous conduct such as that alleged here.

■ Respondent argues that even if it is held the direct recipient of allegedly outrageous conduct may bring suit based upon the tort of outrage, the claim here stated is inadequate. There are limitations on the tort that we specifically noted in *Grimsby*.[2] With these limitations in mind, the trial court first determines whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Restatement (Second) of Torts § 46; *Alcorn v. Anbro Eng'r, Inc., supra* at 498; *Muhich v. Family Fin. Corp.,* 72 Wis. 2d 625, 241 N.W.2d 619 (1976).

---

[2]In *Grimsby v. Samson,* 85 Wn.2d 52, 59, 530 P.2d 291 (1975), we adopted many of the comments to Restatement (Second) of Torts § 46, and stressed: "First, the emotional distress must be inflicted *intentionally or recklessly;* mere negligence is not enough. Second, the conduct of the defendant must be *outrageous and extreme.* . . . it is not enough that a 'defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.' Liability exists 'only where the conduct has been *so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'* (Italics ours.) Comment *d* further points out that liability in the tort of outrage 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' In this area plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration. Clearly a case–by–case approach will be necessary to define the precise limits of such conduct. Nevertheless, among the factors a jury or court should consider are

When one in a position of authority, actual or apparent, over another has allegedly made racial slurs and jokes and comments, this abusive position gives added impetus to the claim of outrageous behavior. Restatement (Second) of Torts § 46, comment *e*. The relationship between the parties is a significant factor in determining whether liability should be imposed. *Alcorn v. Anbro Eng'r, Inc., supra* at 498 n.2. *See Dawson v. Associates Financial Servs. Co. of Kansas, Inc.*, 215 Kan. 814, 529 P.2d 104 (1974); *Golden v. Dungan*, 20 Cal. App. 3d 295, 97 Cal. Rptr. 577 (1971).

Appellant's factual recital that respondent's failure to control their employees and accord him a place to work free from racial discrimination, slurs, comments and pressures may add additional weight to his claim. Where a person is not free to leave but must remain in physical proximity to others who continually make racial slurs and comments, it is for the jury to determine both whether this is a factor in making the claim one of extreme outrage and the extent to which the employer was or should have been aware of these conditions, through its supervisory personnel or by other means.

As we as a nation of immigrants become more aware of the need for pride in our diverse backgrounds, racial epithets which were once part of common usage may not now be looked upon as "mere insulting language." Changing sensitivity in society alters the acceptability of former terms. It is noted in *Alcorn v. Anbro Eng'r, Inc., supra* at 498–99 n.4: "Although the slang epithet 'nigger' may once have been in common usage, along with such other racial characterizations as 'wop,' 'chink,' 'jap,' 'bohunk,' or 'shanty Irish,' the former expression has become particularly abusive and insulting in light of recent developments in the

the position occupied by the defendant (comment *e*), whether plaintiff was peculiarly susceptible to emotional distress and defendant's knowledge of this fact (comment *f*), and whether defendant's conduct may have been privileged under the circumstances (comment *g*).

"Third, the conduct must result in *severe emotional distress* to the plaintiff (comment *j*). Resulting bodily harm would, of course, be an indication of severe emotional distress, but a showing of bodily harm is not necessary."

civil rights' movement as it pertains to the American Negro. Nor can we accept defendants' contention that plaintiff, as a truckdriver must have become accustomed to such abusive language. Plaintiff's own susceptibility to racial slurs and other discriminatory conduct is a question for the trier of fact, and cannot be determined on demurrer." The same conclusion is compelled with regard to Mexican–Americans and the various slang epithets that may have once been in common usage regarding them. It is for the trier of fact to determine, taking into account changing social conditions and plaintiff's own susceptibility, whether the particular conduct was sufficient to constitute extreme outrage.

In determining whether to dismiss appellants' claim, this court must consider respondent's challenge within the framework of CR 12(b)(6). A motion to dismiss questions only the legal sufficiency of the allegations in a pleading. The court need not find that any support for the alleged facts exists or would be admissible in trial as would be its duty on a motion for summary judgment. The question under CR 12(b)(6) is basically a legal one, and the facts are considered only as a conceptual background for the legal determination. *Brown v. MacPherson's, Inc.,* 86 Wn.2d 293, 298, 545 P.2d 13 (1975). The only issue before the trial judge is whether it can be said there is no state of facts which plaintiff could have proven entitling him to relief under his claim. *Barnum v. State,* 72 Wn.2d 928, 435 P.2d 678 (1967); *Grimsby v. Samson, supra* at 55. Viewed in this light, appellant's claim that he was subjected to intentional or reckless conduct on the part of respondent which was beyond all reasonable bounds of decency and caused him severe emotional distress by reason of acts of intimidation, demotions, humiliation in public and exposure to scorn and ridicule, when respondent's agents knew or should have known that by reason of his Mexican nationality and background he was particularly susceptible to emotional distress as a result of respondent's conduct, is within the parameters of the tort of outrage as defined by our cases and the Restatement (Second) of Torts § 46(1).

The judgment of dismissal is reversed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, HOROWITZ, and DOLLIVER, JJ., concur.

STAFFORD, J. (concurring in the result only)—It must be stressed that the "facts" which set the stage for this opinion were derived from mere allegations in plaintiff's claim for relief. The sole issue is whether the allegations state a claim that will support the tort of outrage as defined in Restatement (Second) of Torts § 46(1) and *Grimsby v. Samson*, 85 Wn.2d 52, 530 P.2d 291 (1975).

In essence, the instant case observes that the allegations claim a series of intentional, reckless acts and circumstances which, if proved, *could be deemed* by a jury to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Grimsby v. Samson, supra* at 59. If a jury should so find and also determined that the conduct proximately caused "severe emotional distress to the plaintiff," the resulting damage would support recovery under the tort of outrage. *Grimsby v. Samson, supra* at 59. Nevertheless, we should make it abundantly clear that we are not declaring, as a matter of fact or a matter of law, that the alleged acts and circumstances are to be equated with the tort of outrage. Whether the alleged acts and circumstances ultimately meet the tests of *Grimsby* and the Restatement is a *jury question.*

I take this cautionary approach because I fear the majority's discussion of the nation's growing social sensitiveness to formerly acceptable language leads us too easily from an area of original social acceptance, and subsequent nonacceptance, to the area of legal liability. In fact, a cursory reading of the opinion and consideration of the cited law review article by W. Prosser, together with the proposition for which the treatise by W. Buckland and A. McNair is cited, could easily cause one to assume that the holding of

this case either runs counter to, or at least greatly expands upon, the very carefully chosen words of *Grimsby* which were based upon the equally exacting terminology of Restatement (Second) of Torts § 46, particularly comment *d*. The majority goes even further to say generally that "[w]hen one in a position of authority, actual or apparent, over another has allegedly made racial slurs and jokes and comments, this abusive position gives added impetus to the claim of outrageous behavior." It cites Restatement (Second) of Torts § 46, comment *e*. Yet, even comment *e* closes with the admonition: "Even in such cases, however, the actor has not been held liable for mere insults, indignities, or annoyances that are not extreme or outrageous." See also comments *d* and *f* which contain similar cautionary remarks.

Lest we leave the impression that every epithet, joke, comment, economic and racial slur, embarrassment or hurt feelings is ipso facto abusive within the terms of comments *d, e* and *f* or may support a claim for damages, we should recall specifically what was said in *Grimsby*. We expressed with care that "liability in the tort of outrage 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' In this area plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration." *Grimsby v. Samson, supra* at 59. In the same paragraph we also stressed most carefully that "it is not enough that a 'defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Grimsby v. Samson, supra* at 59.

*We cannot say, as a matter of fact or a matter of law,* that the alleged conduct in this case is the equivalent of the tort of outrage. It is actionable only, if after considering all of the surrounding circumstances, a *jury* concludes that the conduct is so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency and should be regarded as atrocious and utterly intolerable in a civilized society. We hold only that the allegations, if proved, provide a jury question. Restatement (Second) of Torts § 46, comment *h*.

BRACHTENBACH and HICKS, JJ., concur with STAFFORD, J.