[No. 22854-4-I.   Division One.   March 5, 1990.]

RICHARD G. NORD, ET AL, *Respondents*, v. SHORELINE
SAVINGS ASSOCIATION, ET AL, *Defendants*,
ROBERT MONSON, *Appellant*.

*Ralph I. Freese,* for appellant.

*M. Scott Dutton,* for respondents.

SCHOLFIELD, J.—Robert Monson appeals a judgment awarding plaintiffs Richard Nord and Roger Childs $5,000 in economic damages and $15,000 each for emotional distress. We affirm the award for economic damages, but reverse and dismiss the awards for emotional distress.

## FACTS

In 1977, Robert Monson, Richard Nord, and Roger Childs formed a partnership known as CMN Corporation for developing and selling real estate. Although the partnership apparently did well for a number of years, high interest rates in the early 1980's caused financial difficulties for them, resulting in the loss through trustee's sales of several development properties.

In late 1981, it was decided that each partner should go his separate way, and the unfinished properties were distributed among the three men. Pertinent to the case before us, Monson received as his share a project at Lake Stevens known as "Cedar Cove." The CMN partnership, under the name of "Wanico", continued to hold a completed project consisting three fourplexes in Lake Forest Park, in King County, known as the "Bo Van" property. Although the Bo

Van project was completed, Shoreline Savings still held a mortgage on the property.

Shoreline Savings had also loaned money on the Cedar Cove project, and the loan balance at the time the partners separated was approximately $500,000. Shoreline refused Monson's request for further financing. Monson then obtained an $800,000 loan commitment from Cascade Savings which would pay off Shoreline's underlying loan balance. Cascade refused, however, to finance a sewer assessment on the property, amounting to $292,000. Furthermore, Cascade apparently made its loan commitment contingent upon Monson finding financing for the sewer assessment.

Ultimately, Shoreline agreed to finance the sewer assessment and to subordinate to Cascade's loan, but only on condition that it be granted second deeds of trust on both the Cedar Cove property and the Bo Van property. Shoreline prepared a second deed of trust covering the two properties. Monson was asked to sign, and did sign the document, in his capacity as president of Shomon Homes, Inc., on March 19, 1982. Shomon Homes was Monson's solely owned corporation, formed after the partnership disbanded.

As it was drawn up, this second deed of trust was ineffective to create a second deed of trust on the Bo Van property, which was still held by the Wanico partnership. Even if Monson had signed the deed of trust in his individual capacity, the Wanico partnership agreement required that all partners vote to approve any encumbrance on the property. Monson testified at trial that he told Nord that Shoreline wanted the second deed of trust on the Bo Van property, and that because the former partners were trying to help each other out, Nord had given his permission.

However, Nord's testimony was that although Monson mentioned to him that something might have to be worked out concerning the Bo Van property to enable Monson to

finance the Cedar Cove project, Nord did not grant permission, but rather, he told Monson, "Let us know what you need to do and get back to us. And . . . we'll try to help you." Nord stated that he never intended by those words to give permission for the second deed of trust. Nord testified that it was not his understanding that Monson was asking him to consent to something specific.

The rent receipts from the Bo Van property were insufficient to meet the monthly loan obligation to Shoreline. However, Wanico managed to keep the loan current through May 1982, by transferring funds from other projects. Attempts were made to sell the property as early as November 1981. Nord hired a real estate agent, Harold Yaphe, in the spring of 1982 to attempt to sell the property. According to Yaphe's trial testimony, the property did not sell because Monson was unwilling to reduce the selling price from $600,000. Yaphe testified that, in his opinion, the property's fair market value at that time was $550,000 to $560,000.[1]

When no sale occurred, Monson suggested to his partners that Wanico execute a deed in lieu of foreclosure, which they did in December 1982. The testimony of Nord and Childs indicates that they were reluctant to do so because they believed they had equity in the property. Shoreline paid the Wanico partners $12,000 in return for their quitclaim deed. At that time, the loan balance was $517,108. According to Monson, Shoreline sold the property in February 1983, but took a loss of $63,765 on the transaction.[2]

---

[1]Nord and Childs' brief indicates that the total of the encumbrances on the Bo Van property in November 1982, when Shoreline issued its notice of default, was in excess of $725,000. The mortgage balance, plus delinquency fees, was $463,326, and the second deed of trust was in the amount of $292,000. However, all parties concede that the second deed of trust would not have been enforceable. Thus, Nord and Childs' contention that the encumbrances exceeded fair market value is not supported.

[2]The record contains testimony as to the various concessions given to the buyer, but we have not found the $63,765 figure testified to at any place in the record.

Nord's testimony indicated that he first learned of the second deed of trust in the spring of 1986. He and Childs filed their lawsuit in October 1986, against Monson, Shoreline, and Marvin Wright.[3] Nord and Childs' lawsuit alleged unfair and deceptive practices in violation of the Consumer Protection Act, misrepresentation, negligence, conspiracy, and breach of loan agreements. The complaint sought damages arising from the execution of the second deed of trust on the Bo Van property and Monson's actions thereafter with regard to the Bo Van property.

On June 23, 1987, the trial court granted all defendants partial summary judgment on plaintiffs' Consumer Protection Act claims, dismissing the claims with prejudice. Nord and Childs were granted leave to file their second amended complaint on February 10, 1988. The new complaint alleged breach of contract, imposition of constructive trust, misrepresentation, breach of fiduciary duty, conspiracy, and negligence.

On April 1, 1988, the trial court granted additional partial summary judgment, dismissing the conspiracy claims against all defendants, and dismissing the claims for fraud and misrepresentation against Shoreline and Wright. As noted above, Wright was dismissed from the lawsuit on June 7, 1988, and all claims against Shoreline were dismissed by stipulation and order on June 8, 1988.[4]

On July 6, 1988, the case went to trial on Nord and Childs' claims against Monson. Evidence was presented by the parties concerning the various transactions conducted by the partners, including the Cedar Cove and the Bo Van

---

[3]Wright was the former president of Shoreline Savings. He and his marital community were dismissed from the lawsuit on June 7, 1988. They are not parties to this appeal.

[4]This order, however, preserved Nord and Childs' right to appeal. Although Shoreline was initially a respondent to Nord and Childs' appeal in the linked case (cause 22750-5-I), on October 16, 1989, the parties filed a stipulation and order of dismissal with prejudice, dismissing Shoreline from the appeal. At oral argument, Nord and Childs notified this court that the entire appeal in that case was dismissed.

transactions. Nord and Childs testified that they believed Monson had wanted to prevent them from learning about the second deed of trust on the Bo Van property, such that he was willing to allow the Wanico partnership to return the property to Shoreline and lose its equity, rather than conduct a sale where the second deed of trust would come to light.

Nord testified concerning his emotional distress that when he learned of the second deed of trust he was "distressed and very hurt", and that he was "upset and incensed". Nord testified that it was very distressing to think that they could have sold the Bo Van property. Childs testified that he was astonished and angered when he learned about the second deed of trust. Nord testified further that it was his opinion that the Bo Van property was lost because Monson gave them advice that served Monson's best interests. Nord stated that he "fe[lt] very badly about everything."

Prior to resting, Nord and Childs took a voluntary nonsuit on the claims for negligence, breach of contract, and negligent misrepresentation. Thus, the only claims submitted to the jury were the claims of fraud and breach of fiduciary duty against Monson.

Over Monson's objection, the trial court's instruction 3 informed the jury:

> The plaintiffs claim that the defendant breached his fiduciary duty to them in one or more of the following respects:
> 1. Wrongfully pledging the Bovan property to Shoreline Savings & Loan by execution of a second deed of trust in March 1982[.]

Monson's objection for including this item in the claim for breach of fiduciary duty was that the statute of limitations had run.

The trial court instructed the jury with regard to damages in pertinent part as follows:

> If you find for the plaintiffs your verdict should include the following items:
> 1. An amount to compensate plaintiffs for the loss of their equity if any in the Bovan property.

If you find that defendant engaged in intentional wrongdoing which proximately caused damage to plaintiffs, then your verdict should include:

1. An amount to compensate plaintiffs for the emotional distress, if any, they suffered as a result of defendant's wrongful conduct.

. . . .

The law has not furnished us with any fixed standards by which to measure non–economic damages. With reference to these matters you must be governed by your own judgment, by the evidence in the case, and by these instructions.

Instruction 13.

In addition, the trial court refused to give Monson's proposed instruction clarifying when damages for emotional distress may be awarded. This proposed instruction stated as follows:

EMOTIONAL DISTRESS–GROUNDS FOR RECOVERY

Emotional distress for breach of contract is not recoverable unless the breach is intentional, wanton or reckless, and the defendant knew or had reason to know, when the contract was made, that the breach would cause mental suffering for reasons other than pecuniary loss, or if defendant's conduct constitutes the tort of outrage.

A companion instruction proposed by Monson but refused, defined the tort of outrage as follows:

TORT OF OUTRAGE

A person who through intentional or reckless action causes severe emotional distress to another is liable if his or her actions are so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community.

The jury returned a verdict in favor of the plaintiffs in the amounts of $5,000 for economic damages, and $15,000 each for emotional distress. Monson moved for a judgment n.o.v., which the trial court denied.

Monson timely appealed the jury verdict.

STATUTE OF LIMITATIONS

Monson argues that Nord and Childs' claim was barred by the statute of limitations, because their lawsuit was filed 3 years 9 months after the last act alleged to have given rise to their claims occurred, *i.e.,* the execution of the deed in

lieu of foreclosure. This case went to trial on claims of breach of fiduciary duty and fraud. Former RCW 4.16.080 sets forth the appropriate statute of limitations in pertinent part as follows:

**Actions limited to three years.** Within three years:

. . . .

(4) An action for relief upon the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud;

A cause of action for fraud involving a fiduciary relationship is also governed by the 3-year statute of limitations and does not accrue until the aggrieved party discovers acts constituting fraud. *See Interlake Porsche + Audi, Inc. v. Bucholz,* 45 Wn. App. 502, 728 P.2d 597 (1986), *review denied,* 107 Wn.2d 1022 (1987).

In applying the discovery rule to determine when a cause of action accrues, it must be noted that this rule is an exception to the general rule that a cause of action accrues when a party has the right to apply to the court for relief. The discovery rule requires the exercise of due diligence and will usually not be applied where the plaintiff has ready access to the information that a wrong has occurred. *Metropolitan Servs., Inc. v. Spokane,* 32 Wn. App. 714, 649 P.2d 642, *review denied,* 98 Wn.2d 1008 (1982). Although the question of whether the trial court correctly formulated the discovery rule is a question of law, the actual application of the rule is a question of fact. *Ohler v. Tacoma Gen. Hosp.,* 92 Wn.2d 507, 598 P.2d 1358 (1979).

Monson argues that Nord and Childs knew or should have known about his actions with regard to the Bo Van property at the time the last act concerning the property took place in December 1982, when the partnership gave Shoreline the deed in lieu of foreclosure. Monson also argues that Nord and Childs had access to the same information that he had, and thus, should have discovered any alleged fraud in 1982. We disagree.

Nord and Childs' point that, in the absence of any knowledge of the second deed of trust taken on the Bo Van

property, they had no reason to believe that Monson's interests with regard to the Bo Van property were not the same as theirs, is well taken. We hold that the jury reasonably could have determined the factual question before them by deciding that Nord and Childs only knew about the alleged fraud when they found out about the second deed of trust. Nord testified, and it was not disputed, that this occurred in the spring of 1986.

It might be argued that the discovery of the second deed of trust is irrelevant, because it was unenforceable. However, that argument goes to the question of whether the case has merit, *i.e.*, whether a fraud was actually perpetrated, not to the question of when the plaintiffs discovered the facts constituting a claim for fraud. Nord and Childs filed their action well within the 3–year statute of limitations, which began to run in the spring of 1986, when Nord discovered the second deed of trust on the Bo Van property.

## ECONOMIC DAMAGES

Nord and Childs conceded at both the trial court level and on appeal that *in and of itself*, the second deed of trust on the Bo Van property did not cause them any damage. However, they argue that Monson's alleged conduct of frustrating the possibility of sale of the property prior to foreclosure, along with strongly suggesting that the deed in lieu of foreclosure was the only option for the partnership, caused damage to Nord and Childs. Thus, the damages, if any, resulted from the partnership's loss of equity in the property.

The proper amount of damages in a particular case is a question for the trier of fact, and a damage award will generally not be overturned on appeal when it is within the range of the evidence. *Island Air, Inc. v. La Bar*, 18 Wn. App. 129, 566 P.2d 972 (1977). The primary applicable principle for awarding tort damages is that the owner be

monetarily compensated for the loss sustained. Courts generally look to "market value" to ascertain a value for property. *Cf. Massey v. Tube Art Display, Inc.,* 15 Wn. App. 782, 551 P.2d 1387 (1976). Fair market value is generally defined as the value for which property could have been sold in a voluntary sale between a willing buyer and a willing seller. *Merchant v. Peterson,* 38 Wn. App. 855, 690 P.2d 1192 (1984).

The evidence before the trier of fact here concerning the fair market value of the Bo Van property was twofold. Plaintiff's real estate expert testified that, in his opinion, the Bo Van property was worth, at the pertinent time, between $550,000 and $560,000. In addition, evidence showed that the property was ultimately purchased from Shoreline for $585,000. Even taking Shoreline's estimate of the final balance due on the Bo Van loan of $517,108, this would leave a minimum equity amount of approximately $33,000. The Wanico partners were paid $12,000 by Shoreline in exchange for the deed in lieu of foreclosure, leaving a remainder of $21,000. Thus, the jury's total award of $5,000 in economic damages was not outside the evidence.

Monson argues that Shoreline's costs and concessions to the buyer must be taken into account when using Shoreline's sale of the property to calculate fair market value. This issue need not be decided here. Yaphe's expert testimony as to the fair market value was adequate to show that the partnership had at least some equity in the property, such that Nord and Childs were damaged if Monson fraudulently induced the partners to execute the deed in lieu of foreclosure. The jury apparently answered that question affirmatively, and Monson challenges only the *amount* of the award. Thus, we hold that the jury's award of economic damages was supported by the evidence and will not be overturned.

## EMOTIONAL DISTRESS DAMAGES

In *Cagle v. Burns & Roe, Inc.,* 106 Wn.2d 911, 726 P.2d 434 (1986), the Washington Supreme Court discussed the

availability of damages for emotional distress. The *Cagle* court noted that Washington courts have taken the liberal position that damages for emotional distress are available merely upon proving the commission of an intentional tort. *Cagle,* at 916.

The *Cagle* court went on to state that Washington courts have not restricted an award of damages for emotional distress only to situations where the intentional act affected dignity or personality interests. The *Cagle* court noted that recovery of emotional distress damages has been allowed in numerous instances where intentional or willful acts have violated public policy.

Nord and Childs argue that emotional distress damages are recoverable for *any* intentional tort. We believe that Washington courts have, albeit not always clearly, limited recovery for emotional distress to egregious circumstances. In *Cagle,* the plaintiff was wrongfully terminated when she was unwilling to violate Nuclear Regulatory Commission procedures. *Cagle,* at 913. The *Cagle* court held that the plaintiff could recover damages for emotional distress upon a showing of actual anguish or emotional distress. The plaintiff was not required to further establish that the defendant acted intentionally or that emotional distress was foreseeable, once liability for wrongful termination of employment in violation of public policy was shown. *Cagle,* at 919, 921.

In *Browning v. Slenderella Sys.,* 54 Wn.2d 440, 341 P.2d 859 (1959), a black woman made a telephone appointment for a courtesy demonstration of the Slenderella treatments. When she arrived for her appointment, she was asked to wait for over 2 hours while Caucasian women were served ahead of her. Finally, when she asked if she was going to be served, she was told that only Caucasians had ever been served, and that she would not be happy at the salon. *Browning,* at 442.

Noting that damages may be had for mental or emotional distress, even in the absence of physical injury, when caused by an intentional act, the *Browning* court stated

that an act of discrimination in violation of a statute is "a wrongful act intentionally done." *Browning,* at 446. However, the *Browning* court went on to state that not every emotional distress requires an award of damages. According to the *Browning* court, authorities agree that the emotional distress must be "'severe emotional distress.'" *Browning,* at 447 (quoting Restatement of Torts § 46 (1948 Supp.)).

The *Browning* court went on to note that the previous Restatement had provided that emotional distress without accompanying physical harm did not subject the actor to liability. However, the 1948 supplement stated as follows:

"CONDUCT INTENDED TO CAUSE EMOTIONAL DISTRESS ONLY. One who, without a privilege to do so, intentionally causes severe emotional distress to another is liable

"(a) for such emotional distress, and

"(b) for bodily harm resulting from it."[5]

*Browning,* at 447. According to the *Browning* court, the key word is "severe." The opinion goes on to quote from the comments provided for § 46 (1948 Supp.) of the Restatement:

"(g) In short, the rule stated in this section imposes liability for intentionally causing severe emotional distress in those situations in which the actor's conduct has gone beyond all reasonable bounds of decency. The prohibited conduct is conduct which in the eyes of decent men and women in a civilized community is considered outrageous and intolerable. . . .

"(h) The amount of damages to be awarded is a question for the trier of fact, subject to the power of the court to set aside a manifestly unreasonable award. . . .

"(i) The one who seeks damages must prove that he did suffer severe emotional distress. Although emotional distress is subjective there are many situations in which the genuineness of the claim that it was suffered is supported by the objective facts concerning the actor's conduct. . . ."

*Browning,* at 448. The *Browning* court overturned the award of damages for emotional distress to the plaintiff.

---

[5]Restatement (Second) of Torts § 46 (1965) now reads:

"Outrageous Conduct Causing Severe Emotional Distress

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

■ Applying the law to the facts before us, we must reverse the award of damages for emotional distress. Strictly speaking, the holding in *Cagle* may be limited to wrongful termination cases. However, even if we were to utilize the language in *Cagle,* we would find that it is not particularly instructive concerning the *quantum* of evidence required to show emotional distress. The *Cagle* opinion refers to actual anguish or emotional distress. We find the language in *Browning* with its reference to the Restatement of Torts to be more useful. We hold that a plaintiff must show severe emotional distress.

Nord and Childs failed to provide adequate evidence of severe emotional distress. Even without the requirement of objective symptoms, an application of the language of the Restatement shows that their testimony falls short of the mark. The testimony that the plaintiffs were "distressed and very hurt", and "upset and incensed" does not rise to the level of severe emotional distress by any stretch of the imagination.

The judgment in favor of Nord and Childs in the amount of $5,000 for economic damages is affirmed. The judgment in favor of Nord and Childs in the amount of $15,000 each for emotional distress is reversed.

PEKELIS and WINSOR, JJ., concur.

Reconsideration denied July 12, 1990.

Review granted at 115 Wn.2d 1001 (1990).